NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11303

COMMONWEALTH  vs.  ROBERT SCOTT.[1]


Suffolk.      September 5, 2014. - December 26, 2014.

Present:  Gants, C.J., Spina, Botsford, Lenk, & Hines, JJ.


Homicide.  Evidence, Third-party culprit.  Constitutional Law,
     Fair trial.  Due Process of Law, Fair trial.  Fair Trial.
     Jury and Jurors.  Practice, Criminal, Capital case, Fair
     trial, Argument by prosecutor, Jury and jurors,
     Substitution of alternate juror, Question by jury,
     Instructions to jury.


Indictment found and returned in the Superior Court
Department on December 19, 2008.

The case was tried before Peter M. Lauriat, J.


Ruth Greenberg for the defendant.
Paul B. Linn, Assistant District Attorney, for the
Commonwealth.


LENK, J.  In December, 1984, a young woman was found dead,

her body badly beaten, in a vacant lot in Boston.  Twenty-three

---

[1] Also known as Sultan Omar Chezulu.

years later, deoxyribonucleic acid (DNA) was extracted from samples taken from the victim's body and clothing soon after her death and run through a national computerized database. A match was found with the defendant's DNA. The defendant was tried for murder in the first degree. His defense at trial was that he had had consensual sex with the victim but had not been the killer. The jury returned a verdict of guilty on theories of premeditation, extreme atrocity or cruelty, and felony-murder. The defendant appeals from his conviction.

The defendant claims that the evidence was insufficient to support the verdict, and that other errors in the proceedings require a new trial. These include the judge's exclusion of evidence purported, by the defendant, to show that police had investigated the case inadequately or that the crime might have been committed by a third party; the prosecutor's remarks, in his closing argument, that there had been no evidence that the victim had engaged in "risky behavior"; and the judge's instruction to the jury, after one original juror had been discharged, that an alternate juror should get "up to speed" about a question that had been posed by the jury and answered by the judge.

Having reviewed the entire record pursuant to G. L. c. 278, § 33E, we discern no error requiring reversal, and no cause to

exercise our authority to reduce the defendant's conviction to a lesser degree of guilt or to order a new trial.

1. Facts. We summarize the facts the jury could have found, reserving certain details for later discussion.

In December, 1984, the victim's body was found by a passerby in a vacant lot in Boston. She was eighteen years old. An autopsy revealed that the victim had suffered multiple blunt impact injuries to her head, fractures to her skull, lacerations and contusions to her face, and fractured and loosened teeth. A sock had been tied as a ligature around the victim's neck. She had been alive when her injuries were inflicted.

Although the victim was identified, the case remained unsolved for many years. After being contacted by the victim's sister in 2006, the Boston police department reopened the case. Police reexamined evidence collected in the original investigation, including the victim's clothing and vaginal and anal swabs taken from her body at the autopsy.

The vaginal and anal swabs, as well as a stain from the victim's skirt, were found to contain sperm cells. DNA testing was performed on those cells, and the DNA pattern found in the cells was run through a national database.[2] The database

_____

[2] Most of the information in this database, the combined DNA index system (known as CODIS), concerns individuals who have

returned a match with the defendant's DNA. The likelihood that the DNA pattern shared by the defendant and by the tested samples would be found in a random individual was one in at least 430 million.

The evidence reexamined by police also included a pair of underwear found on the ground about five or six feet away from the victim's body. DNA matching the victim's DNA was found on the underwear. No sperm cells were detected on them.

The defendant was living and working in Boston at the time of the victim's death. By 2008, when the case was again being investigated, he was living in Atlanta, Georgia. Boston police detectives traveled to Atlanta in late 2008 to arrest the defendant. After he was arrested and brought back to Boston, the defendant said to a detective, "I have to face the music now."[3]

At trial, the theory of the defense was that the defendant had had consensual sex with the victim prior to her death, but that he was not her killer. The defendant sought to introduce evidence suggesting that the victim might have been killed by third parties or that the police investigation had been lacking.

been convicted of crimes. The nature of the database was not revealed to the jury.

[3] The defendant was also wanted on a charge of failure to register as a sex offender, a fact not disclosed to the jury.

As discussed in detail infra, the judge excluded much, though not all, of this evidence.

The victim's sister and the victim's friend and former neighbor testified that they had never heard of the defendant and that the victim had never been with older men or with men who did not speak Spanish.[4] The victim's sister also testified that the victim had been at home during the nights of the week of Christmas, 1984, including the night before the victim was killed; and that, on the day of the killing, the victim had left home early in the morning and had worked until 6 P.M.

A police criminologist, Kevin Kosiorek, opined that the sperm found in the victim's body had been deposited there around the time of her death and at the location where she was discovered. This opinion was based, in part, on the fact that no sperm cells were detected on the victim's underwear; according to Kosiorek, "if somebody is up walking around, . . . semen would be draining out of her and would be on the underwear if she were wearing it . . . ." Kosiorek also stated that the pattern of stains found on the victim's skirt was "consistent with drainage if a person were laying [sic] horizontal[ly]."

---

[4] The defendant had been thirty-six years old at the time of the victim's death. In closing argument, the prosecutor invited the jury to assume that the defendant did not speak Spanish; no evidence concerning this matter was introduced, however.

Kosiorek provided the opinion that sperm "heads," which were identified in this case, are usually detectible only within "a day or maybe a little more" after sexual intercourse. In addition, while only small quantities of sperm and seminal fluid were collected, Kosiorek explained that the amounts collected are not indicative of the amounts actually deposited, and that the amounts deposited are, in any event, poor indicators of the timing of intercourse.[5]

Soon after being charged, the jury submitted a note to the judge, asking, "[C]ould the defense have independently tested any of the physical evidence?" The judge sent back a note stating, "Whether the defendant could seek his own testing of any physical evidence is not a question that was addressed by the evidence. Because you are to confine your deliberations to the evidence presented at the trial, you should not further consider or discuss that question."

---

[5] The defendant's expert, Brian Wraxall, testified about a study that had found that sperm cells can be identified "up to about five and a half days" after sexual intercourse. Wraxall also opined that, based on the amounts of seminal fluid and sperm cells collected in this case, intercourse had occurred "between . . . probably from about an hour to at least . . . [twenty-four] hours" prior to the victim's death.

On the morning after the jury began deliberating, one juror was discharged because she had failed to appear in court.[6] The discharged juror was replaced by an alternate. As discussed more fully infra, the judge instructed the newly-constituted jury that they were to "start [their] deliberations all over again." The judge also stated that the question posed by the jury on the previous day "should be shared with our new juror as well so he is up to speed on communications that our deliberating jury has had with the court."

On the afternoon of the same day, the jury returned a guilty verdict, convicting the defendant of all three theories of murder in the first degree.

2. Sufficiency of the evidence. The defendant argues that the evidence at trial was insufficient to support the verdict. He asserts that, although ample evidence demonstrated that he had had sexual relations with the victim, there was no evidence connecting him to her death.

Our inquiry is "whether, after viewing the evidence in the light most favorable to the Commonwealth, any rational trier of fact could have found the essential elements of the crime beyond

---

[6] The defendant objected to the decision to discharge the juror, noting that he "fe[lt that] this juror is favorable to him." He does not press this objection on appeal, and we discern no error. Another juror had been excused, with the parties' consent, during trial, when he felt poorly and was taken to the hospital.

a reasonable doubt." Commonwealth v. Woods, 466 Mass. 707, 712-713 (2014), citing Commonwealth v. Latimore, 378 Mass. 671, 677-678 (1979). "[T]he evidence and the inferences permitted to be drawn therefrom must be 'of sufficient force to bring minds of ordinary intelligence and sagacity to the persuasion of [guilt] beyond a reasonable doubt.'" Commonwealth v. Latimore, supra at 677, quoting Commonwealth v. Cooper, 264 Mass. 368, 373 (1928) (second alteration in original). Circumstantial evidence alone may suffice. Commonwealth v. Woods, supra at 713, citing Commonwealth v. Nolin, 448 Mass. 207, 215 (2007). The evidence in this case satisfies these requirements.

As detailed, the evidence was not limited to the fact that sperm cells matching the defendant's DNA were found in the victim's body and on her clothing. The pattern of sperm on the victim's skirt, and the absence of sperm on the victim's underwear, indicated that the sperm had been deposited around the time of the victim's death and at the location where her body was discovered. The people closest to the victim, namely her sister and her friend and former neighbor, testified that they had never heard of the defendant and that the victim had never been with older men or with men who did not speak Spanish. The victim's sister also testified to the victim's whereabouts on the day of her death and on the preceding nights. All of these pieces of evidence tended to negate the possibility that

the defendant had had sex with the victim on some prior occasion unrelated to her death. Finally, the defendant stated to a police officer, after he was arrested, that he had "to face the music now."

Minds "of ordinary intelligence and sagacity," Commonwealth v. Cooper, 264 Mass. at 373, could find this evidence sufficiently forceful to establish beyond a reasonable doubt that the defendant had killed the victim deliberately, upon a reflective decision to do so; that the killing involved the infliction of injuries brutal both in number and in severity; and that it was carried out in the course of the felony of aggravated rape. The evidence was therefore sufficient to support the verdict of guilty on all three theories of murder in the first degree.

3. Third-party culprit evidence and Bowden evidence. As stated, the defendant sought to present evidence suggesting, in his view, that the victim might have been killed by third parties, and that the police had conducted an inadequate investigation. The focal point of this evidence was a set of police reports found in the files of a Boston police detective, Frank Mulvey, who had been involved in the original investigation. Mulvey had died by the time of trial.

The most detailed police report in Mulvey's file (first report) related the following account, provided in its entirety

by the victim's mother, speaking through an interpreter.  In October, 1984, police searched the apartment of one of the victim's friends, a woman named Yvonne.  Drugs and cash that belonged to the victim's former boy friend, who was known as Chulo,[7] were hidden in an adjacent apartment, and police did not find them.  The victim and Yvonne falsely told Chulo that the drugs and the cash had been confiscated.  Yvonne used the money to buy a car.  Chulo subsequently threatened the victim at gunpoint, and she "told him the whole story."  Chulo set the car bought by Yvonne on fire.  The first report also included another, apparently unrelated piece of information provided by the victim's mother:  the mother reportedly stated that the victim had told her, shortly before her death, that she "had been present in [the Jamaica Plain section of Boston] when [an African-American] guy had been shot in the head."

Two other police reports contained in Mulvey's file were far less informative.  According to one (second report), a police sergeant had received "information [that Yvonne] had some Dominicans do [the victim] because she thought that she ratted on a drug deal."  According to the other (third report), police officers had relayed "info[rmation] they heard on [the] street"

---

[7] To protect the privacy of the victim, we refer to Yvonne by her first name and to Chulo by his nickname.  See G. L. c. 265, § 24C.

that police should "look into" Chulo, who was "not carrying a full load."[8]

The judge did not permit the defendant to enter these police reports in evidence, stating that "[t]here's no indicia sufficient . . . for the court to determine [their] reliability." The judge also excluded certain questions that defense counsel wished to ask witnesses about the reports. Specifically, counsel was not permitted to ask Yvonne's sister whether Yvonne had been involved with drugs; and in his cross-examination of the police detective who had reopened the investigation, Juan Torres, counsel was not permitted to discuss the substance of the police reports. In addition, the judge denied the defendant's request for a jury instruction concerning alleged inadequacies in the police investigation, although the defendant was permitted to make arguments about this matter in closing.[9]

---

[8] Defense counsel also asserted at a hearing that police had been told that another acquaintance of the victim had called the victim's workplace on the day after she died, before her body had been discovered, to say that the victim would not arrive at work that day. The evidence supporting this assertion was not included in the defendant's proffer of third-party culprit evidence or Bowden evidence. See Commonwealth v. Bowden, 379 Mass. 472 (1980).

[9] The defendant preserved an objection to the judge's decision to refrain from giving an instruction about the alleged inadequacy of the police investigation. He does not press this objection on appeal, and "[t]here was no error because the

The defendant argues that the police reports, as well as testimony that might have been elicited by the excluded lines of questioning, should have been admitted both as evidence of third-party culprits and as evidence of an inadequate investigation under Commonwealth v. Bowden, 379 Mass. 472 (1980). Because the defendant preserved his objections to the judge's rulings on these issues, we review for prejudicial error. See Commonwealth v. Cruz, 445 Mass. 589, 591 (2005).

a. Third-party culprit evidence. "A defendant may introduce evidence that tends to show that another person committed the crime or had the motive, intent, and opportunity to commit it." Commonwealth v. Silva-Santiago, 453 Mass. 782, 800 (2009) (Silva-Santiago), quoting Commonwealth v. Lawrence, 404 Mass. 378, 387 (1989). We have "given wide latitude to the admission of relevant evidence that a person other than the defendant may have committed the crime charged. 'If the evidence is "of substantial probative value, and will not tend to prejudice or confuse, all doubt should be resolved in favor of admissibility."'" Id. at 800-801, quoting Commonwealth v. Conkey, 443 Mass. 60, 66 (2004). See Commonwealth v. Rosa, 422

---

giving of such an instruction is never required." Commonwealth v. Williams, 439 Mass. 678, 687 (2003).

Mass. 18, 23 (1996), quoting Commonwealth v. Keizer, 377 Mass. 264, 267 (1979).

We have imposed two types of restrictions on the admission of third-party culprit evidence, recognizing that "feeble third-party culprit evidence . . . inevitably diverts jurors' attention away from the defendant on trial and onto the third party, and essentially requires the Commonwealth to prove beyond a reasonable doubt that the third-party culprit did not commit the crime." Silva-Santiago, supra at 801. First, in order to be admitted, third-party culprit evidence "must have a rational tendency to prove the issue the defense raises, and [it] cannot be too remote or speculative." Id., quoting Commonwealth v. Rosa, 422 Mass. at 22. In addition, third-party culprit evidence is often hearsay, namely out-of-court statements "offered for the truth of the matter asserted --  that a third party is the true culprit." Silva-Santiago, supra at 801. Such evidence may be admitted "only if, in the judge's discretion, 'the evidence is otherwise relevant, will not tend to prejudice or confuse the jury, and there are other "substantial connecting links" to the crime.'" Id., quoting Commonwealth v. Rice, 441 Mass. 291, 305 (2004). See Mass. G. Evid. § 1105 (2014).

The opportunity to present third-party culprit evidence is of "constitutional dimension," Silva-Santiago, supra at 804 n.26, because it is rooted in the right of criminal defendants

to "a meaningful opportunity to present a complete defense."
Crane v. Kentucky, 476 U.S. 683, 690 (1986), quoting California
v. Trombetta, 467 U.S. 479, 485 (1984).  See art. 12 of the
Massachusetts Declaration of Rights.  Accordingly, we examine a
judge's decision to exclude third-party culprit evidence
"independently," Silva-Santiago, supra at 804 n.26, under "a
standard higher than that of abuse of discretion," Commonwealth
v. Conkey, 443 Mass. at 67 n.14.

Examining the exclusion of the proffered third-party
culprit evidence independently, we are satisfied that there was
no error.  To begin with, even had it not been hearsay, the
evidence offered by the defendant was "remote" and
"speculative."  Silva-Santiago, supra at 801.  In other words,
for the following reasons, this evidence was limited in both
reliability and relevance.

The second report and the third report were patently
unreliable.  The information in these reports was vague; the
second report relayed unspecified "information" that Yvonne "had
some Dominicans do" the victim, and all that the third report
suggested was that police "should look into" Chulo, who was "not
carrying a full load."  In addition, the basis for the vague
information in these reports was unclear:  the second report was
written as a result of a telephone call from a police sergeant
who said he "ha[d] information," without specifying the source

of it; and the information in the third report was "heard on [the] street."

The first report, which originated from an interview with the victim's mother, was more detailed. However, the basis of the mother's information was specified only as far as the statement that the victim had witnessed an unidentified African-American man being shot in Jamaica Plain; the mother reportedly had heard of this incident from the victim herself. The first report did not explain how the mother had learned that the victim and Yvonne had stolen drugs from Chulo, that Chulo had subsequently threatened the victim with a gun, or that he had burnt Yvonne's car.

Moreover, the judge permitted the defendant to conduct a voir dire of the mother during trial.[10] The mother testified at voir dire that she did not remember "anything" about speaking to police after her daughter's death, and that she did not remember her daughter telling her about stealing drugs from Chulo, being threatened at gunpoint, or seeing an African-American man shot in Jamaica Plain. Instead of illuminating the first report, the voir dire of the mother thus rendered that report even more enigmatic.

---

[10] The victim's mother did not testify before the jury.

The first report also was not probative of the crux of a third-party culprit defense, namely "that another person committed the crime or had the motive, intent, and opportunity to commit it." Silva-Santiago, supra at 800, quoting Commonwealth v. Lawrence, 404 Mass. at 387. The report implied that Yvonne, Chulo, or both might have believed that the victim had wronged them. It would be a stretch to say that such beliefs amounted to a "motive" for murder, particularly since the first report did not reveal when exactly Chulo was said to have threatened the victim or to have burnt Yvonne's car. In any event, the first report provides no indication that either Yvonne or Chulo had an intent or an opportunity to kill the victim, or that they did, in fact, commit the crime. Id. "Evidence of a third party's ill will or possible motive is insufficient alone to support a defense under the third-party culprit doctrine." Commonwealth v. Wright, 469 Mass. 447, 466 (2014), citing Commonwealth v. Mandeville, 386 Mass. 393, 398 (1982). See Commonwealth v. Wood, 469 Mass. 266, 275-276 (2014); Commonwealth v. Bizanowicz, 459 Mass. 400, 418-419 (2011).

Thus, it would have been permissible for the judge to conclude that the evidence proffered by the defendant was "too remote or speculative" to be admitted, even if it had not been

hearsay.  See Silva-Santiago, supra at 801, quoting Commonwealth v. Rosa, 422 Mass. at 22.

Moreover, as hearsay, both the police reports and the questioning about them were admissible as third-party culprit evidence "only if, in the judge's discretion, 'the evidence is otherwise relevant, will not tend to prejudice or confuse the jury, and there are other "substantial connecting links" to the crime.'"  Id., quoting Commonwealth v. Rice, 441 Mass. at 305.  For reasons similar to those previously discussed, the evidence offered in this case did not satisfy these requirements.

The defendant identified no "connecting links" between Yvonne or Chulo and the crime itself, in terms of actual intent to harm the victim, geographical or chronological proximity to the crime scene, or the like.  Even the first police report, the most informative of the three, suggested only a speculative and uncorroborated potential motive for the murder.  The evidence proffered by the defendant also did not satisfy the requirement of "not tend[ing] to prejudice or confuse the jury."  Silva-Santiago, supra at 801.  The defendant wished to share with the jury police officers' notes about vague information from unclear sources.  This evidence would have invited the jury to mistake the memorialization of uncorroborated leads for known facts about events preceding the murder.  Cf. Commonwealth v. Mandeville, 386 Mass. at 398-399 (statement suggesting that

victim's estranged husband suspected third party would have tended to mislead jury because it had no tendency to prove that third party actually was murderer).  It would have tended, like all third-party culprit evidence, to "divert[] jurors' attention away from the defendant on trial and onto the third party." Silva-Santiago, supra.  No less problematically, it would have posed a risk of drawing the jury into an evaluation, irrelevant under the circumstances, of the victim's lifestyle and character.  See Commonwealth v. Benjamin, 430 Mass. 673, 678 (2000) (generally, "evidence of a victim's character is not admissible in a criminal case").  We conclude, therefore, that the judge's exclusion of the evidence proffered by the defendant as third-party culprit evidence was not error.

b.  Bowden evidence.  Evidence also may be admissible to show "[t]he failure of the authorities to conduct certain tests or produce certain evidence," because "[t]he fact that certain tests were not conducted or certain police procedures not followed could raise a reasonable doubt as to the defendant's guilt in the minds of the jurors."  Commonwealth v. Bowden, 379 Mass. at 485-486 (citations omitted).  "[F]ailure of the police to investigate leads concerning another suspect is sufficient grounds for a Bowden defense."  Silva-Santiago, supra at 802, citing Commonwealth v. Phinney, 446 Mass. 155, 166 (2006).  See Mass. G. Evid. § 1107 (2014).

Bowden evidence generally is "offered not to show the truth of the matter asserted, but simply to show that the information was provided to the police." Silva-Santiago, supra at 802. See Commonwealth v. Reynolds, 429 Mass. 388, 391 (1999). Such evidence, therefore, is not subject to the limitations applicable to hearsay third-party culprit evidence. In order for Bowden evidence to be admitted, however, the judge must "conduct a voir dire hearing to determine whether the third-party culprit information had been furnished to the police, and whether the probative weight of the Bowden evidence exceeded the risk of unfair prejudice to the Commonwealth from diverting the jury's attention to collateral matters." Silva-Santiago, supra at 803. Cf. Commonwealth v. Pytou Heang, 458 Mass. 827, 851-852 (2011) (relevant evidence in general should be excluded if its "probative value [is] substantially outweighed by the danger of unfair prejudice or the risk of misleading the jury"); Mass. G. Evid. § 403 (2014). The exclusion of proffered Bowden evidence is reviewed under an abuse of discretion standard. See Silva-Santiago, supra at 804; Commonwealth v. Mayfield, 398 Mass. 615, 629 (1986).

The same police reports offered by the defendant as third-party culprit evidence, and the same attendant lines of questioning, were also offered as Bowden evidence. Because this evidence came from police records, it was not necessary for the

judge to conduct a voir dire hearing to determine whether the information had been furnished to the police. Silva-Santiago, supra at 803. The judge excluded the proffered Bowden evidence after considering the arguments of counsel; such evidence was only to be admitted if its probative weight "exceeded the risk of unfair prejudice to the Commonwealth from diverting the jury's attention to collateral matters." Id. For the reasons we discuss, we discern no abuse of discretion in its exclusion.

First, the evidence proffered was of limited probative value. The police reports from Mulvey's file pointed to investigative leads that police had received in the course of the original investigation, twenty-five years earlier. The file did not detail the manner in which police had investigated these leads. Mulvey, who had died, could not describe the course that the original investigation had run. The defendant also did not offer any additional evidence on this matter. Thus, the evidence proffered was relevant primarily in that it would have enabled the jury to surmise that police had failed, in early 1985, "to investigate leads concerning another suspect," Silva-Santiago, supra at 802, given that Mulvey's file memorialized the leads but not any follow-up to them. This inference, while perhaps permissible, would have represented weak support for a Bowden defense.

The excluded evidence also could have shed light on the adequacy of the police's reexamination of the original leads after the investigation was revived.  This matter was, however, probed with some vigor in the defendant's cross-examination of Torres, the detective who reopened the investigation.  As mentioned, the judge ruled that the substance of the reports found in Mulvey's file could not be revealed; but he permitted defense counsel to note in his questioning that certain named individuals, including Yvonne and Chulo, were identified in the file, and to ask Torres whether these individuals had been investigated further in the course of the reopened investigation.  The Commonwealth's redirect examination revealed that police had spoken to Yvonne after reopening the case, had arranged for her to testify before the grand jury, and had learned that Chulo had been deported by the time the investigation had been reopened.[11]  The excluded evidence would thus have made only a limited contribution to a Bowden defense focused on the more recent police investigation; while this evidence could have informed the jury's assessment of the

_____

[11] Detective Juan Torres also testified that the acquaintance of the victim who had reportedly called her workplace on the day after she was killed had died by the time of the renewed investigation.

police's renewed efforts, those efforts were themselves revealed at trial.

Moreover, as discussed, the information in the police reports was largely from unidentified origins, and much of it was vague. Consequently, even if the jury were to believe that police had failed to pursue certain avenues of investigation effectively, either initially or after reopening the case, this failure would only weakly have suggested that a third party had committed the crime. In other words, it was unlikely that the shortfalls of the investigation suggested by the proffered evidence "could raise a reasonable doubt as to the defendant's guilt in the minds of the jurors." See Commonwealth v. Bowden, 379 Mass. at 486.[12]

On the other side of the scale, the defendant's Bowden evidence posed a risk, as discussed earlier, of confusing the jury, and of diverting its attention to collateral questions, primarily conjecture concerning the nature of the original investigation. It would also have opened the door to speculation, immaterial here, about the victim's lifestyle and character.

---

[12] In addition, the voir dire of the victim's mother suggested that it would have been difficult for police to collect additional information about the events detailed in the first police report.

Also relevant to our analysis is the fact that the judge did allow the defendant to pursue a number of lines of questioning and argument in support of a Bowden defense.  See Commonwealth v. Bizanowicz, 459 Mass. at 417, citing Commonwealth v. Ridge, 455 Mass. 307, 316 (2009).  As noted, defense counsel was permitted to ask Torres whether police had revisited various investigative avenues, including avenues based on Mulvey's file.  He was also allowed to argue, in closing, that the collection and retention of evidence from the crime scene had been careless, and that hairs collected at the crime scene, as well as the sock tied around the victim's neck, could have been tested for DNA but were not.

In the circumstances, while the judge might well have admitted more of the proffered Bowden evidence, we discern no abuse of discretion in his decision otherwise.

c.  Constitutional claim.  As noted, the opportunity to present third-party culprit evidence "is of constitutional dimension."  Silva-Santiago, supra at 804 n.26.  This constitutional dimension stems from the right, guaranteed by the United States Constitution, to "a meaningful opportunity to present a complete defense."  Crane v. Kentucky, 476 U.S. at 690, quoting California v. Trombetta, 467 U.S. at 485.  Similarly, but more broadly, art. 12 of the Massachusetts Declaration of Rights provides that "every subject shall have a

right to produce all proofs, that may be favourable to him."
The defendant argues that if the Massachusetts doctrine
concerning third-party culprit evidence permitted the judge to
exclude the evidence proffered in this case, then that doctrine
is consequently unconstitutional.  This argument is unavailing.

The United States Supreme Court has held that the right to
present a defense is "abridged by evidence rules that
'infring[e] upon a weighty interest of the accused' and are
'arbitrary' or 'disproportionate to the purposes they are
designed to serve.'"  Holmes v. South Carolina, 547 U.S. 319,
324-325 (2006), quoting United States v. Scheffer, 523 U.S. 303,
308 (1998) (alteration in original).  Our jurisprudence
concerning the circumstances in which third-party culprit
evidence may be excluded is consistent with these strictures.
See Commonwealth v. Smith, 461 Mass. 438, 446-447 (2012);
Commonwealth v. Ruell, 459 Mass. 126, 131-133 (2011).  We have
permitted the exclusion of such evidence in view of concerns
with limited probative value, unfair prejudice, confusion of the
issues, and misleading the jury.  See Silva-Santiago, supra at
801.  The Court in Holmes v. South Carolina, 547 U.S. at 326,
recognized that these considerations are not "arbitrary,"
stating that "well-established rules of evidence permit trial
judges to exclude evidence if its probative value is outweighed
by certain other factors such as unfair prejudice, confusion of

the issues, or potential to mislead the jury." More specifically, the Court quoted a "widely accepted" rule that, while the "accused may introduce any legal evidence tending to prove that another person may have committed the crime with which the defendant is charged," such evidence "may be excluded where it does not sufficiently connect the other person to the crime, as, for example, where the evidence is speculative or remote." Id. at 327, quoting 40A Am. Jur. 2d, Homicide § 286, at 136-138 (1999).

The standards we have described here and in prior cases are thus not "arbitrary." They also are not "disproportionate to the purposes they are designed to serve," Holmes v. South Carolina, 547 U.S. at 324-325, quoting United States v. Scheffer, 532 U.S. at 308, particularly given our insistence that all doubts concerning evidence "of substantial probative value" that "will not tend to prejudice or confuse . . . should be resolved in favor of admissibility," see Silva-Santiago, supra at 801, quoting Commonwealth v. Conkey, 443 Mass. at 66. There was no error.

4. Prosecutor's closing argument. The defendant argues that certain statements in the prosecutor's closing argument were improper. He focuses on the fact that, after successfully requesting that the judge exclude the defendant's proffered third-party culprit evidence, the prosecutor pointed out that no

evidence of that type had been presented.  Because the defendant did not object to the prosecutor's argument, we review for a substantial likelihood of a miscarriage of justice.

We have held that:

"Counsel may not, in closing, 'exploit[] the absence of evidence that had been excluded at his request.'  Such exploitation of absent, excluded evidence is 'fundamentally unfair' and 'reprehensible.'  '[A] party's success in excluding evidence from the consideration of the jury does not later give that party license to invite inferences . . . regarding the excluded evidence.'"

Commonwealth v. Harris, 443 Mass. 714, 732 (2005), quoting Commonwealth v. Carroll, 439 Mass. 547, 555 (2003), Commonwealth v. Haraldstad, 16 Mass. App. Ct. 565, 568 (1983), and Commonwealth v. Mosby, 11 Mass. App. Ct. 1, 9 (1980) (alterations in original).  Here, a number of the prosecutor's remarks invited precisely such a prohibited inference, and should not have been made.  The prosecutor argued:

"There's nothing about [the victim's] life that would give anybody who knew her a motive to kill her.  It is a rape/murder by a stranger.

"You know from her life she's a regular [eighteen] year old living a regular [eighteen] year old's life.  She was not making risky choices.  She does not have risky friends.  She is not engaging in risky behavior. . . .

"So when she walked that night . . . , she was walking as an innocent young woman.  A woman without enemies.  A woman without people who would have a motive to kill her.  A woman who had done nothing herself to cause this."

These comments, and especially the prosecutor's statements that the victim "was not making risky choices" and was "not

engaging in risky behavior," would not have seemed plausible had the defendant's proffered third-party culprit and Bowden evidence been admitted. In this sense, the prosecutor's argument "exploit[ed] the absence of evidence that had been excluded at his request." See Commonwealth v. Harris, supra, quoting Commonwealth v. Carroll, supra.

We conclude, however, that there is no substantial likelihood that a miscarriage of justice occurred. In Commonwealth v. Harris, supra, we stated:

> "In determining whether an error in closing argument requires reversal, we consider whether defense counsel made a timely objection; whether the judge's instructions mitigated the error; whether the error was central to the issues at trial or concerned only collateral matters; whether the jury would be able to sort out any excessive claims or hyperbole; and whether the Commonwealth's case was so strong that the error would cause no prejudice."

Consideration of these factors, and particularly the degree to which the error was "central to the issues at trial" and the strength of the Commonwealth's case, leads us to conclude that reversal is not required. First, the prosecutor's remarks concerning the victim's lack of "risky behavior" were not a key element of his closing argument. Unlike the prosecutor in Commonwealth v. Haraldstad, 16 Mass. App. Ct. at 568, the prosecutor here did not extensively "mine[] th[e] vein" created by the excluded testimony. His argument focused on the evidence that the defendant's sperm was found in the victim's body and on

her clothing; that the pattern of the sperm indicated, according to the Commonwealth's expert, that it had been deposited approximately when and where the victim had died; and that, according to the individuals closest to the victim, she had never been with older men or with men who did not speak Spanish. The prosecutor also devoted much of his argument to countering the defendant's efforts to minimize the prosecution's case, and to recounting the brutality of the murder.

In addition, the jury heard some evidence that tended to support the prosecutor's characterization of the victim's past. The victim's sister testified that the victim did not go out often, at least with her; and a friend of the victim testified that the victim "seemed to take care of herself. She used to dress like any young girl, you know, and she used to be clean. She used to keep to herself, I think."

In the circumstances, the prosecutor's misguided remarks did not undermine the fundamental fairness of the trial. "[W]e are substantially confident that, if the error had not been made, the jury verdict would have been the same." Commonwealth v. Ruddock, 428 Mass. 288, 292 n.3 (1998). We leave that verdict undisturbed.[13]

---

[13] In his reply brief, the defendant suggests that the prosecutor's closing argument mocked the defendant's name and

5.  <u>Instructions to the alternate juror</u>.  The defendant
argues that the judge erred in his instructions to the
reconstituted jury, after an original deliberating juror had
been discharged, concerning the question posed by the original
jury and the judge's answer to it.  The defendant argues that
the judge's instruction undercut his directive that the
reconstituted jury must begin its deliberations anew.  Although
the defendant did not object to the instruction at trial, he now
contends that it amounted to a structural error that requires
reversal without a showing of prejudice.  See <u>Commonwealth</u> v.
<u>Smith</u>, 403 Mass. 489, 493 (1988).

"If a judge determines that the substitution of an
alternate juror is appropriate, then the judge . . . must
instruct the jury to disregard all prior deliberations and begin
its deliberations again."  <u>Commonwealth</u> v. <u>Haywood</u>, 377 Mass.
755, 770 (1979).  See <u>Commonwealth</u> v. <u>Carnes</u>, 457 Mass. 812, 829
(2010); <u>Commonwealth</u> v. <u>Smith</u>, 403 Mass. at 492.  The judge
provided such instructions in this case, stating:

> "[O]nce we have a new deliberating juror . . . you
> must start your deliberations all over again.  I appreciate
> you have not been deliberating for long, but you must start
> anew because you now constitute a new jury of twelve
> deliberating jurors.  And you must all start from the

appealed to racial prejudice.  We see no support for these
contentions in the record.

beginning so that everyone can hear and share and discuss this case anew. . . .

"[L]et me repeat, ladies and gentlemen of the new deliberating jury, you are to start your deliberations anew, afresh, start over again."[14]

These emphatic instructions were not undermined by the judge's discussion of the question that had been asked by the original jury and answered on the previous day. The judge said:

"[T]here was a note that was given to me by the deliberating jury with a question. I answered that question. The note and the question are with the jury and should be shared with our new juror as well so he is up to speed on communications that our deliberating jury has had with the court."

Contrary to the defendant's characterizations of these statements, the judge did not instruct the jury to broach any previous discussions with the new juror. Rather, he directed that the jury's written question, and presumably the judge's written response, be "shared" with the new juror. This directive was proper. The judge's written answer to the jury's question was, in essence, an addendum to the instructions that

---

[14] In addition, before determining which jurors would serve as alternates, the judge stated: "If during the course of the jury's deliberations a deliberating [juror] for good and sufficient reason is excused by the court, then . . . one of the alternates will be drawn at random to replace that deliberating juror and the jury[,] which will now constitute [a] new group of [twelve] individuals[,] will be instructed to begin its deliberations all over again in order that the new juror be a full participant and listen to and be able to speak about the evidence in this case."

the judge had given in the presence of all the jurors, before the alternates were selected and before the jury began to deliberate.  It was appropriate that the new juror be provided with this additional instruction, just as it would have been appropriate for the alternate jurors to be present had the judge answered the jury's question in open court rather than by means of a note.  No reasonable jurors would have read into the judge's instruction permission to share prior deliberations with the new juror, or to continue the original jury's deliberations instead of beginning anew.[15]

6.  Review pursuant to G. L. c. 278, §§ 33E. We have reviewed the entire record and conclude that there is no basis to exercise our authority pursuant to G. L. c. 278, § 33E, to reduce the verdict of murder in the first degree or to order a new trial.

Judgment affirmed.

---

[15] Because there was no error, we do not reach the question whether failure to comply with Commonwealth v. Haywood, 377 Mass. 755 (1979), could, in some circumstances, represent structural error.