NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11138

COMMONWEALTH  vs.  JESSE CAMACHO.

Suffolk.     May 8, 2015. - September 8, 2015.

Present:  Gants, C.J., Cordy, Duffly, Lenk, & Hines, JJ.

Homicide.  Firearms.  Assault and Battery by Means of a
    Dangerous Weapon.  Armed Assault with Intent to Murder.
    Defense of Others.  Evidence, Prior violent conduct,
    Relevancy and materiality, Hearsay, Flight, Disclosure of
    evidence, Exculpatory.  Practice, Criminal, Capital case,
    Discovery, Disclosure of evidence, Instructions to jury,
    Assistance of counsel, Argument by prosecutor.

Indictments found and returned in the Superior Court
Department on April 2, 2008.

The cases were tried before Patrick F. Brady, J.; a motion
for discovery and for a new trial, filed on January 11, 2013,
was heard by him; and a motion for reconsideration was
considered by him.

Elizabeth A. Billowitz for the defendant.
Zachary Hillman, Assistant District Attorney (Patrick M.
Haggan, Assistant District Attorney, with him) for the
Commonwealth.

CORDY, J.  In the early morning hours of January, 24, 2008,

Jeffrey Santiago was shot and killed at a night club in Chelsea.

Surveillance footage and multiple eyewitnesses identified the defendant, Jesse Camacho, as the shooter.  The defendant was charged with murder in the first degree, unlawfully carrying a firearm, assault and battery by means of a dangerous weapon, and armed assault with intent to murder.  At trial, the Commonwealth proceeded with respect to the murder charge on theories of deliberate premeditation and extreme atrocity and cruelty.  The defendant contended that he acted in defense of another.  A jury found the defendant guilty on all charges.

On appeal, the defendant claims several errors, including error in the trial judge's rulings excluding both so-called Adjutant evidence of prior violent acts of the victim and his friends, see Commonwealth v. Adjutant, 443 Mass. 649 (2005), and statements the defendant made to his girl friend.[1]  We find no reversible error arising from the defendant's claims.  Further, we conclude that there is no basis for exercising our authority under G. L. c. 278, § 33E, to reduce the verdict of murder to a lesser degree of guilt or order a new trial.  Accordingly, we affirm the defendant's convictions.

Background.  We recite the facts in the light most favorable to the Commonwealth, reserving certain details for our

---

[1] The defendant also raises claims related to the judge's jury instruction, claims of ineffectiveness of trial counsel, and errors in the denial of his postconviction motions for discovery.

analysis of the issues raised on appeal. On the evening of January 23, 2008, the victim went to a nightclub (club) in Chelsea with his friends Toulou Thach and Gabriel Rodriguez. Once there, they met up with Edward Vozzella and Kevin Reis. The defendant went to the same club that night, arriving with his friend Mario Sunsin and meeting up with Marcelo Miranda, who had arrived with his friends Danny Diaz and another man.

The defendant, Sunsin, and Miranda were members of the Tiny Rascals Gang (TRG). TRG had prior problems with the Bloods, a rival gang, of which Rodriguez was a member. Sunsin and Miranda were familiar with Rodriguez, as Rodriguez and Miranda had previously been in a fight that resulted in Miranda's hospitalization. More recently, Sunsin and Miranda had thrown Rodriguez out of a hotel room, forcing him to walk home in the cold in his underwear.

On Miranda's arrival at the club earlier that night, he saw Rodriguez and asked him if there was going to be any trouble. Rodriguez replied, "No." Diaz testified that he had had a confrontation at the door of the club with a man he later identified as the victim. Eventually, the defendant and his group sat down to watch the club's dancers perform, while members of the victim's group congregated by the bar. At this point, the victim wandered toward the club's stage and stood

against a wall behind the defendant, conversing with a bouncer and watching the dancers.

Subsequently, the victim's group left the bar area and came over to stand behind the defendant and his group of friends. The victim conversed with his friends for a few moments before moving away from them towards the dancers' entrance to the stage. Meanwhile, Rodriguez sat down next to Miranda, and the two conversed for a few minutes before Rodriguez went back to his group of friends. Miranda told the defendant's group to keep their heads up because "something could happen." Almost immediately after Rodriguez left the seat next to Miranda, Rodriguez threw a beer bottle at Sunsin's head.[2] Sunsin then tackled Rodriguez, the two men fell to the ground, and some of the victim's group jumped on top of Sunsin and started to hit him.

As Sunsin tackled Rodriguez, the defendant jumped up from his seat, took out a firearm, "rack[ed]" it, and started firing at the victim's group. While the victim, Vozzella, and Joseph Upton (a bouncer) were attempting to flee from the gunfire, shots struck them.[3] The victim subsequently fell to the ground.

---

[2] Mario Sunsin testified that the bottle hit him in the head, but there was conflicting evidence from at least one witness as to whether the bottle actually hit him.

[3] Sunsin may also have been hit by the defendant's gunfire.

As the defendant chased the fleeing group out of the club, he approached the victim, who remained lying on the floor, and shot him two more times from less than two feet away.[4]  The defendant then left the bar, attempting to shoot others as they ran.  He fled Massachusetts days after the shooting and was apprehended in Mexico nine months later.

Procedural history.  In April, 2008, a grand jury returned indictments charging the defendant with murder in the first degree, in violation of G. L. c. 265, § 1; unlawfully carrying a firearm, in violation of G. L. c. 269, § 10 (a); two counts of assault and battery by means of a dangerous weapon, in violation of G. L. c. 265, § 15A; and two counts of armed assault with intent to murder, in violation of G. L. c. 265, § 18 (b).  The jury rejected the defendant's claim of defense of another and convicted him on all the indictments, including murder in the first degree under theories of deliberate premeditation and extreme atrocity and cruelty.

The defendant was sentenced to life imprisonment for murder in the first degree; from four to five years for unlawfully carrying a firearm, concurrent with his sentence for murder; from ten to twelve years for armed assault with intent to murder Upton, consecutive to his sentence for murder; and from ten to

---

[4] The medical examiner testified that these two gunshot wounds to the victim's chest were fatal.

twelve years for armed assault with intent to murder Vozzella, consecutive to his sentence for armed assault with intent to murder Upton.[5]  The defendant's convictions of assault and battery by means of a dangerous weapon were placed on file.  The defendant filed a notice of appeal.

In January, 2013, the defendant filed a motion for postconviction discovery of gang-related evidence and a motion for a new trial.  He subsequently filed an amended motion for a new trial, presenting an additional issue of ineffective assistance of counsel. On June 28, 2013, the trial judge denied the defendant's discovery motion and partially denied the defendant's amended motion for a new trial, ordering an evidentiary hearing solely on the issue of ineffective assistance of trial counsel.  In January, 2014, the judge denied the remainder of the defendant's amended motion for a new trial, as well as a motion to reconsider the denial of his discovery motion.  The defendant appealed both of these rulings.

The defendant subsequently filed a motion to reconsider the denial of his amended motion for a new trial, which was denied.[6] The present case represents the defendant's consolidated appeal

---

[5] The defendant's sentences for assault with intent to murder were later changed to run concurrently with each other.

[6] The defendant also filed a further amendment to his motion for a new trial, which was subsequently declared moot.

from his convictions as well as the denials of his motions for a new trial and for postconviction discovery.

Discussion.  "When this court reviews a defendant's appeal from the denial of a motion for a new trial in conjunction with his direct appeal from an underlying conviction of murder . . . , we review both under G. L. c. 278, § 33E."  Commonwealth v. Burgos, 462 Mass. 53, 59, cert. denied, 133 S. Ct. 796 (2012).  In so doing, "[w]e first inquire if the denial of the motion was based on an error of law or an abuse of discretion. . . . If so, we then must determine whether such error create[d] a substantial likelihood of a miscarriage of justice" (citation omitted).  Commonwealth v. Leng, 463 Mass. 779, 781 (2012).  "We extend special deference to factual determinations made by a motion judge who was also the trial judge, as here" (citation omitted).  Id.

1.  Adjutant evidence.  At the time of trial, the law of this Commonwealth, as delineated in Adjutant, 443 Mass. at 664, was, "where the identity of the first aggressor is in dispute and the victim has a history of violence, . . . the trial judge has the discretion to admit evidence of specific acts of prior violent conduct that the victim is reasonably alleged to have initiated, to support the defendant's claim of self-defense" (emphasis added).  Such evidence "may be admitted as tending to prove that the victim and not the defendant was likely to have

been the 'first aggressor'" because it may show "that the victim acted in conformance with his character for violence." Adjutant, 443 Mass. at 654. This evidence has "substantial probative value," id. at 656, when used exclusively for this "limited purpose." Id. at 660.

Nearly three years after the defendant's convictions, we decided Commonwealth v. Chambers, 465 Mass. 520, 527-530 (2013), which clarified the breadth of admissible prior violent acts under Adjutant. In Chambers, we held that the definition of "first aggressor" included not only the person who initiated the confrontation, but also the person who initiated the use or threat of deadly force, as "resolution of both issues may assist the jury in deciding whether the prosecution has met its burden of proving that the defendant did not act in self-defense." Id. at 529-530.

At trial, the defendant's principal defense was that he reasonably used force to defend Sunsin against assault. On appeal, he argues that the judge erred, under Adjutant, in barring him from introducing evidence of the past violent crimes of the victim, Rodriguez, and Reis. Conceding that there was no dispute as to who was the first aggressor, the defendant nonetheless submits that such evidence was admissible because the victim, Rodriguez, and Reis were among the group that jumped on Sunsin. Accordingly, he contends that evidence of their

violent pasts would better contextualize any conflicting evidence of the events and better assist the jury in determining whether the Commonwealth met its burden of proving that the defendant did not act in defense of another.

The defendant further contends that this evidence is admissible under Chambers because, although it was undisputed at trial that Rodriguez was the original first aggressor, it was disputed whether Rodriguez or the defendant escalated the altercation by initiating deadly force. As the defendant objected to the exclusion of the proffered evidence at trial, we review for prejudicial error.[7] See Commonwealth v. Morales, 464 Mass. 302, 313 n.19 (2013).

---

[7] The Commonwealth acknowledges that the defendant objected to the judge's interpretation of Commonwealth v. Adjutant, 443 Mass. 649 (2005), but argues, for the first time on appeal, that the defendant substantively relies on the decision of this court in Commonwealth v. Chambers, 465 Mass. 520, 527-530 (2013). Accordingly, the Commonwealth submits that the defendant's claim should now be reviewed under the standard of a substantial likelihood of a miscarriage of justice. Chambers was published in June, 2013, approximately six months after the defendant filed his original motion for a new trial (but prior to the filing of his amended motions). We agree with the defendant that the Commonwealth's position is an excessively narrow interpretation of issue preservation. On appeal, the defendant does not object to the exclusion of the proffered evidence on grounds wholly distinct from Adjutant, but rather cites to Chambers to the extent that Chambers offers a straightforward clarification of key language in Adjutant. The record reflects that the primary thrust of the defendant's Adjutant argument has remained consistent throughout the evolution of this case. Therefore, because the defendant's trial objection "sufficiently apprised the judge of the grounds on which it was based," and he continues to object to the exclusion of the evidence on these

The defendant's claim that the judge erroneously excluded the proffered evidence under Adjutant, and as later clarified by Chambers, is meritless, as both cases are inapplicable here. It was undisputed at trial that Rodriguez was the first aggressor who started the chain of events that resulted in the victim's death. Accordingly, when assessed exclusively through the lens of Adjutant, the judge correctly determined that evidence of the victim's, Rodriguez's, and Reis's prior violent acts was irrelevant to prove who acted as the first aggressor.[8] See Commonwealth v. Gaynor, 73 Mass. App. Ct. 71, 75 (2008) (no error in excluding proposed Adjutant evidence where identity of first aggressor not in dispute).

---

same grounds (supplemented only by a case that further interprets these grounds), his argument was sufficiently preserved. Commonwealth v. Cancel, 394 Mass. 567, 574 (1985). See Commonwealth v. Mullane, 445 Mass. 702, 717 n.9 (2006) (issue preserved where defendant only objected to breadth of term's definition at trial and argued for specific definition of same term on appeal).

[8] When the judge made his initial ruling on this issue, he was correct to rely on the narrow definition of "first aggressor" as delineated in Adjutant, rather than the broader definition subsequently announced by Chambers. In Chambers, we even acknowledged that, under prior precedent, a judge reasonably could have believed that Adjutant evidence was inadmissible where it was undisputed who initiated the first confrontation. Chambers, 465 Mass. at 527-528. However, as detailed infra, Chambers also does not support the proffered evidence's admission, and therefore the judge's ruling was proper under either understanding of "first aggressor."

Our conclusion remains unchanged even in the wake of Chambers. Chambers merely expanded Adjutant to hold that "[w]here a victim's prior act or acts of violence demonstrate a propensity for violence, . . . Adjutant evidence is as relevant to the issue of who initiated the use or threat of deadly force as it is to the issue of who initiated an earlier nondeadly assault, and such evidence may be admitted to assist the jury where either issue is in dispute" (emphasis added; other emphasis omitted). Chambers, 465 Mass. at 529-530. Essentially, Chambers clarified the reach of the term "first aggressor," but did nothing to disturb our ruling that the identity of this person must remain in dispute. Id.

In Morales, 464 Mass. at 307, we explained the rationale underlying Adjutant: "[T]here was a greater danger that the exclusion of the evidence concerning the victim's violent acts could prejudice the defendant because the evidence might offer the only way for a jury to assess the validity or likelihood of the defendant's account of what happened" (emphasis added). Moreover, in Adjutant, 443 Mass. at 651, we explicitly noted that where "[t]here was conflicting testimony as to when the defendant and the victim armed themselves for their fatal confrontation," Adjutant evidence "may be the jury's only means of assessing the likelihood of the defendant's account of the incident." Id. at 650 n.1.

In contrast to cases in which Adjutant evidence was admitted to assist the jury in assessing conflicting evidence regarding the identity of the first aggressor, see, e.g., Chambers, 465 Mass. at 525-526 (circumstances of deadly altercation in dispute); Commonwealth v. Pring-Wilson, 448 Mass. 718, 723-724 (2007) (defendant's version of fight "differed markedly" from that of witnesses), here the significant events that occurred prior to the defendant shooting the victim are not in dispute such that the proposed evidence fits into "the narrow framework . . . that Adjutant posits." Morales, 464 Mass. at 310 n.13. Surveillance footage and independent witness testimony alike establish that Rodriguez began the fight by throwing a bottle at Sunsin,[9] Sunsin tackled Rodriguez, Sunsin and Rodriguez fell to the ground, a melee ensued where individuals from the victim's group jumped on Sunsin and started to hit him, and the defendant began firing a gun into the crowd.

Given this largely undisputed evidence, the primary question for the jury was not who began the altercation or escalated it to deadly force, but rather whether the defendant was legally entitled to use the force that he did in defense of another. We recognize that there may be a question as to which

_____

[9] The defendant also suggests that Kevin Reis threw a chair in concert with Gabriel Rodriguez's attack on Sunsin, but the evidence in the record suggests that Reis did this in an effort to escape after the defendant began shooting.

act, the bottle throwing or the gun firing, escalated the fight into a deadly confrontation,[10] but that is a wholly distinct question from which individual initiated each such act.  Neither the identity of the person who threw the bottle nor the identity of the person who fired shots is in dispute, and the limited sweep of Adjutant and Chambers does not authorize the introduction of evidence to shed light on any other question.  See Gaynor, 73 Mass. App. Ct. at 75 (evidence of victim's prior violent acts "immaterial" where contested issues had nothing to do with identity of first aggressor).  Accordingly, we cannot say that the judge erred in excluding the proffered Adjutant evidence.

The specific facts of this case render Adjutant and Chambers inapplicable for another important reason:  such evidence is admissible only where the victim is involved in the altercation that leads to his death.  See Adjutant, 443 Mass. at 650; Chambers, 465 Mass. at 529.  Here, there is simply no credible evidence that the victim was involved in any of the events that unfolded between the time when Rodriguez threw the bottle and the defendant fired his weapon.  No witness testified that the victim was involved in the melee or that the victim

---

[10] In addition to the bottle and the gun, a box cutter was found in the area where the fight occurred and there was testimony that Sunsin suffered an injury that may have come from a knife, but there is no evidence that this weapon was seen or used during the melee.

physically assaulted or threatened to assault Sunsin or any member of the defendant's group. Although the defendant suggests that Diaz's testimony places the victim as one of the men involved in the fray, a careful reading of his testimony does not support this. Diaz never said that the victim was among the men who jumped on Sunsin. Rather, the most Diaz's testimony offers is that the victim was friends with the people fighting and that the victim ran from the area in which the fight was taking place when the defendant began firing a weapon.

Additionally, the surveillance footage reveals that the victim was not with either group during the skirmish. Rather, the victim moved toward the back of the stage and out of the screen almost two and one-half minutes before Rodriguez threw the bottle at Sunsin; he remained there until after the defendant began shooting, and he reentered the screen while attempting to flee gunfire. As there was no evidence that the victim played any role in the brawl or posed any threat to the defendant or the defendant's group, evidence of his prior violent conduct is not probative of why the defendant shot him. See Commonwealth v. Rodriquez, 461 Mass. 100, 111 (2011) (judge correctly excluded evidence of victim's prior violence where no evidence to support defendant's claim of self-defense).

The defendant also argues that the judge erred in denying Adjutant evidence regarding Rodriguez and Reis, as they acted in

concert with the victim's group in the melee. The defendant cites to Pring-Wilson, 448 Mass. at 737, for the proposition that where there are multiple aggressors, Adjutant permits the admission of a third party's violent acts. The defendant's argument misses the mark. Pring-Wilson, 448 Mass. at 737, makes clear that Adjutant evidence is only admissible against a third party on the determination that "in the light most favorable to the defendant, the third party was acting in concert with or to assist the victim" (emphasis added). Accordingly, although it is true that "nothing in Adjutant precludes a judge from admitting evidence of prior acts of violent conduct of a victim's cohort," Pring-Wilson still involved a victim who was very much involved in the altercation that led to his death.[11] Id. Where a defendant claims self-defense against a victim, who with the assistance of a third party cohort may have started the fight that led to the victim's death, evidence of past violence on the part of the victim's associate understandably may be probative of assessing whether the defendant had grounds to use deadly force against the victim. See id. at 737. Here, however, there was no evidence that the victim was a source of

---

[11] Moreover, in Commonwealth v. Pring-Wilson, 448 Mass. 718, 721-725 (2007), there was no video footage available and the jury had heard only conflicting testimony as to whether the victim or his friend had initiated the fight (or whether they had done so jointly).

provocation or played any role in the events leading to his death, and therefore Rodriguez and Reis cannot be considered his "cohorts" such that evidence of their past violent conduct would assist the jury in evaluating why the defendant shot the victim. Accordingly, we conclude that there was no error in the exclusion of the proffered Adjutant evidence.[12]

2. Girl friend's testimony. At trial, defense counsel asked the defendant's girl friend, Evelyn Chaboudt, whether the defendant had explained to her why he fled Massachusetts after the shooting. At sidebar, the defense counsel proffered that, based on a previous statement, Chaboudt would testify that the defendant was a member of TRG; "the other kids involved were the Latin Kings" and "[t]hat is why [the defendant] had an issue with them"; and that is why the defendant fled. Defense counsel made no proffer for the basis of Chaboudt's knowledge of these facts and subsequently acknowledged that evidence regarding the reasons for the defendant's flight could only come from the

---

[12] Additionally, "[o]ur decision in the Adjutant case is specifically limited to situations where the defendant claims self-defense." Commonwealth v. Benoit, 452 Mass. 212, 228 (2008). See Chambers, 465 Mass. at 527-528. Here, the defendant has not argued self-defense, and we decline to extend the Adjutant doctrine to cases involving defense of another in this case.

defendant.[13]  Accordingly, the judge held that these statements

were inadmissible hearsay.  On appeal, the defendant argues that

the judge improperly excluded Chaboudt's proposed testimony, as

it was admissible to show his state of mind when fleeing.

Evidence of flight is generally admissible as some evidence

of consciousness of guilt, see Commonwealth v. Stuckich, 450

Mass. 449, 453 (2008), and "consciousness of guilt, together

with other evidence, may establish guilt."  Commonwealth v.

Epsom, 399 Mass. 254, 259 (1987).  When the Commonwealth

introduces consciousness of guilt evidence, a defendant is

entitled to rebut it.  See Commonwealth v. Hicks, 375 Mass. 274,

277-278 (1978).  In order to rebut the Commonwealth's contention

that the defendant fled due to consciousness of guilt, evidence

that the defendant believed the victim's group was affiliated

with a rival gang may have been admissible to show that he did

so out of a fear of retribution.

Here, defense counsel did not explicitly argue state of

mind at trial, but rather consistently stressed that the thrust

of this line of questioning was to show "the fact that

[Chaboudt] suffered some repercussions from [the defendant's]

being on the run" and "whether or not [Chaboudt] had trouble

---

[13] However, defense counsel also stated at sidebar, "I don't
know whether all of [Chaboudt's] information came from [the
defendant] or not."

because of [the defendant]." Read in its proper context, defense counsel appears to have offered this evidence precisely for the truth of what it asserts, namely, that the defendant and the victim's group truly were affiliates of rival gangs. Accordingly, on this record, we agree that the defendant's statements to Chaboudt were inadmissible hearsay and, as evidentiary rulings "are matters entrusted to the trial judge's broad discretion and are not disturbed absent palpable error," Commonwealth v. Simpson, 434 Mass. 570, 578-579 (2001), we see no reason to disturb the judge's ruling. See Commonwealth v. Fitzpatrick, 463 Mass. 581, 602-603 (2012). To the extent that the defendant now argues that these statements reflected his state of mind, we find no substantial likelihood of a miscarriage of justice in their exclusion. See Commonwealth v. Fowler, 431 Mass. 30, 41 n.19 (2000) (issue not properly preserved where defendant objected on different grounds from those pursued on appeal).

Defense counsel also tried to elicit from Chaboudt that "a few Latin Kings gave [her] trouble after the incident," but the judge ruled that this statement was irrelevant. The judge was well within his discretion to exclude this testimony, as it was not probative of any material issue in this case. It does not shed light on the defendant's state of mind at the time of the shooting, see Fitzpatrick, 463 Mass. at 603, and absent

admissible evidence that the defendant knew he had wronged members of the Latin Kings prior to his flight, it does not explain why he fled.

Even if it was an abuse of discretion to exclude any of the aforementioned statements, there is no indication that exclusion prejudiced the defendant.  "[D]eclarations out of court may be admissible to prove the state of mind or intent of a person when it is a material issue" (emphasis added).  Commonwealth v. Bins, 465 Mass. 348, 365 (2013), quoting Commonwealth v. Magraw, 426 Mass. 589, 594 (1998).  Defense counsel sought all of the proffered testimony in response to an inquiry as to whether the defendant relayed his explanation for fleeing.  Although the Commonwealth mentioned the defendant's flight at trial, consciousness of guilt was not a material issue in this case, as it was undisputed that the defendant shot the victim.  As such, the exclusion of this evidence was not prejudicial.  See Commonwealth v. Garrey, 436 Mass. 422, 440-441 (2002) (improperly admitted evidence not prejudicial where only impacted undisputed point).

3.  Posttrial discovery motion.  The defendant also contends that the judge erred in denying his postconviction motion for discovery of gang-related evidence.  Denial of a defendant's motion for posttrial discovery under Mass. R. Crim. P. 30 (c), as appearing in 435 Mass. 1501 (2001), is reviewed

for abuse of discretion.  See generally Commonwealth v. Martinez, 437 Mass. 84, 97-98 (2002).

The Commonwealth has a duty to disclose favorable evidence that it has in its possession, which could materially aid the defendant.  See Commonwealth v. Tucceri, 412 Mass. 401, 404-405 (1992); Brady v. Maryland, 373 U.S. 83, 87 (1963).  The Commonwealth's failure to disclose such exculpatory evidence may warrant a new trial, Commonwealth v. Murray, 461 Mass. 10, 19 (2011), and where specifically requested favorable evidence is not disclosed the defendant "need only demonstrate that a substantial basis exists for claiming prejudice."  Commonwealth v. Daniels, 445 Mass. 392, 404-405 (2005), quoting Tucceri, 412 Mass. at 412.

In order to prevail on a posttrial discovery motion, a defendant must demonstrate that it is reasonably likely that such discovery will lead to evidence possibly warranting a new trial.  See Daniels, 445 Mass. at 407.  Additionally, the defendant must make a prima facie showing that the evidence sought would have materially benefited the defense and would have factored into the jury's deliberations.  Id., quoting Tucceri, 412 Mass. at 405, 414.

The defendant claims that evidence that the victim and his associates were gang members (requested both before and after trial) would have bolstered his defense of another claim and

factored into the jury's deliberations.  In support, he relies
on Murray, 461 Mass. at 10-11, in which the grant of a motion
for a new trial and postconviction discovery based on gang-
related evidence was affirmed.  There, we noted that gang-
related evidence may be used to "support [a defendant's]
contention that he was fearful for his life" and to impeach a
witness for bias.  Id. at 19-20.

However, the facts of Murray are markedly different from
the facts of this case.  There, more than two years after trial,
twenty members of the Kendall Street Thugs (KST) were indicted
on State and Federal drug charges, and a police lieutenant
submitted an affidavit in Federal court characterizing the group
as a violent drug trafficking gang.  Id. at 17.  The affidavit
specifically mentioned that the victim was a member of the gang,
id., despite the fact that several members of KST had testified
at trial that KST was not a gang, but rather just a group of
friends who had grown up together.  Id. at 15-18.

The defendant claims that the Commonwealth withheld similar
gang-related evidence during his trial.  Although the
Commonwealth provided the defendant with all of the evidence
that was requested by the defendant's pretrial discovery
motion,[14] the defendant nevertheless contends that a statement

---

[14] The defendant's pretrial motion for discovery requested
reports from the Chelsea, Revere, and State police departments

made by the prosecutor at the new trial hearing[15] and a summary
of the shooting provided to the Department of Correction[16]
demonstrated that other gang-related evidence existed and that
the prosecution knew of, and failed to disclose, this evidence.

The defendant has failed to make the necessary showing that
he was entitled to postconviction discovery, as he has not
demonstrated sufficiently that other gang-related evidence
actually existed.  First, at trial, Sunsin explicitly testified
that other than Rodriguez, no rival gang members were present on

_____

pertaining to any gang-related activities of Rodriguez, Reis,
and the victim.  In response, the Commonwealth provided the
defendant with several Chelsea police department reports
concerning these individuals.  Defense counsel acknowledged that
the Commonwealth had provided all of the information that was
requested, to the extent that it was able to do so.  Moreover,
at defense counsel's request, the Commonwealth prepared an
indexed list of every document that it had in its possession to
ensure that defense counsel received each item.

[15] When asked to summarize the factual background of the
case at the hearing on the defendant's motion for a new trial,
the prosecutor stated:

> "Although it didn't come out at the trial itself, there was
> some underlying gang motivation where allegedly the
> defendant . . . and his friends were members of a gang
> known as TRG, which is an acronym for Tiny Rascals Gang.  I
> believe Mr. Gabriel Rodriguez and his friends were more
> affiliated with the Bloods.  So there was some bad blood,
> so to speak, between the two groups.  There were some prior
> instances of violence between Mr. Rodriguez and Mr.
> Suns[i]n."

[16] The report stated, "A verbal altercation began between
friends of [the defendant] and a group of men affiliated with a
rival gang.  This rival group included the deceased victim
. . . ."

the night of the shooting.  Moreover, the prosecutor's statement at the new trial hearing was made during a lengthy recitation of the case's factual background and corroborates what was revealed at trial:  the defendant and his friends were gang affiliated and Rodriguez was affiliated with a rival gang.  His statement that Rodriguez's friends were "more affiliated with the Bloods" is not evidence that the victim was in fact in a rival gang, but only suggests that the victim was "more affiliated" with Rodriguez than he was with the defendant's gang.  Although the prosecutor definitively stated that the defendant and his friends were "members" of a gang, he made no such statement about the victim.  Finally, the Department of Correction report cannot be attributed to the prosecutor.[17]

The defendant's argument that the Commonwealth was required to turn over gang-related evidence hypothetically possessed by other law enforcement agencies is equally unavailing.  Although the Commonwealth has a duty to disclose exculpatory evidence, that duty "only applies to information in the possession of the prosecutor and information in the possession of persons sufficiently subject to the prosecutor's control" (quotation and citation omitted).  Commonwealth v. Beal, 429 Mass. 530, 531 (1999).  If such gang-related evidence existed, which the

_____

[17] This report also is inconsistent with several of the Commonwealth's filed pleadings.

defendant has failed to demonstrate, the Commonwealth was not obligated to search other law enforcement agencies for it.[18]  See Commonwealth v. Thomas, 451 Mass. 451, 454-455 (2008) (information possessed by State Police colonel and registry of motor vehicles not within prosecutor's control; therefore, prosecutor not required to turn over).  See also Commonwealth v. Daye, 411 Mass. 719, 733-734 (1992) (prosecution not required to produce potentially exculpatory police reports because reports not within prosecution's control).

Based on the record before us, the defendant has not demonstrated sufficiently that postconviction discovery would have led to additional evidence warranting a new trial.  Without a showing that other gang-related evidence actually existed, and that the Commonwealth withheld such evidence, we cannot say that it was an abuse of discretion for the judge to deny the defendant's motion.  See Daniels, 445 Mass. at 407.

Moreover, even if such evidence did exist, the defendant has failed to show that it would have materially aided his defense or factored into the jury's deliberations.  The defendant has not demonstrated that he had actual knowledge, on

---

[18] In response to the defendant's pretrial discovery request for gang-related evidence, the Commonwealth informed the defendant that he would have to file a motion under Mass. R. Crim. P. 17, 378 Mass. 885 (1979), to receive information from other law enforcement agencies.  The defendant agreed with this assessment.

the night of January 23, 2008, that anyone in the victim's group (besides Rodriguez) was affiliated with a gang.  Without such a showing, the defendant would be unable to introduce gang-related evidence to bolster his contention that he reasonably feared for Sunsin's life.  See Murray, 461 Mass. at 19-20 (defendant must possess prior knowledge of victim's violent tendencies when attempting to admit such evidence to prove defendant's state of mind).

Similarly, despite what the defendant claims, it is unlikely that any evidence of gang affiliation would have provided substantial impeachment value (e.g., to demonstrate witness bias).  See Murray, 461 Mass. at 20.  On the record before us, there is no evidence that gang affiliation even existed, much less served as motivation for witnesses associated with the victim to testify falsely.  See id.  This is not a case in which members of the victim's group repeatedly denied being affiliated with a gang.  Contrast id. at 20 & n.9 (evidence of group's gang affiliation could be used to impeach witnesses who testified that group not gang and that victim not member).  Rather, none of the testifying witnesses associated with the victim was even asked, much less denied, whether they or the victim were affiliated with a gang.  Thus, the gang-related evidence would have carried little, if any, impeachment value

and it is unlikely that it would have factored into the jury's deliberations.

4. Provocation. At trial, the judge instructed the jury on manslaughter based on excessive force in defense of another, but determined that the defendant was not entitled to a manslaughter instruction on theories of reasonable provocation and sudden combat.[19] The defendant objected to the judge's ruling and we therefore review for prejudicial error. See Commonwealth v. Kelly, 470 Mass. 682, 687-688 (2015).

"Voluntary manslaughter is an unlawful killing 'arising not from malice, but from . . . sudden [heat of] passion induced by reasonable provocation, sudden combat, or [the use of] excessive force in self-defense" (quotation and citation omitted). Commonwealth v. Gonzalez, 465 Mass. 672, 686 (2013). Reasonable provocation is "provocation that would have been likely to produce in an ordinary person such a state of passion, anger, fear, fright, or nervous excitement as would eclipse his capacity for reflection or restraint" (quotation and citation

_____

[19] The Commonwealth's brief incorrectly states that the defendant does not claim that the judge erred in refusing to instruct the jury on sudden combat. The defendant raised this theory in his opening brief, noting that he was incorporating it within his discussion of provocation. In any event, we address these two theories under the singular caption of "provocation," as much of our case law treats them indistinguishably and "[s]udden combat is among those circumstances constituting reasonable provocation." Commonwealth v. Walczak, 463 Mass. 808, 820 (2012) (Lenk, J., concurring). See Commonwealth v. Morales, 70 Mass. App. Ct. 526, 530-532 (2007).

omitted). Commonwealth v. Acevedo, 446 Mass. 435, 443 (2006). "A jury instruction on reasonable provocation is warranted if there is evidence of provocation deemed adequate in law to cause the accused to lose his self-control in the heat of passion, and if the killing followed the provocation before sufficient time had elapsed for the accused's temper to cool" (quotations and citations omitted). Id. Additionally, "[a] jury must be able to infer that a reasonable person would have become sufficiently provoked, and that the defendant was in fact provoked." Commonwealth v. Pierce, 419 Mass. 28, 31 (1994). "Insults and quarreling alone cannot provide a reasonable provocation" (quotation and citation omitted). Commonwealth v. Callahan, 401 Mass. 627, 632 (1988). Although "[a]ll reasonable inferences are drawn in favor of the defendant in deciding whether a manslaughter instruction was supported by the evidence," Commonwealth v. Nichypor, 419 Mass. 209, 216 (1994), it is error to give a manslaughter instruction without some supporting evidence of that crime. Commonwealth v. Walden, 380 Mass. 724, 727 (1980).

Critically, "[i]t is well established that 'provocation must come from the victim'" (emphasis added). Acevedo, 446 Mass. at 444, quoting Commonwealth v. Ruiz, 442 Mass. 826, 838-839 (2004). See generally Commonwealth v. Nelson, 468 Mass. 1, 14 (2014); Commonwealth v. LeClair, 445 Mass. 734, 740 (2006)

(reaffirming "well-established rule that evidence of provocation by a third party, rather than the victim of a homicide, is insufficient to warrant a voluntary manslaughter instruction"). We see no reason to depart from this rule.  The evidence is insufficient to conclude that the victim was one of the aggressors in the fray or did anything to reasonably provoke the actions that led to his death.  See Commonwealth v. Benson, 453 Mass. 90, 95 (2009) (no provocation instruction where insufficient evidence for jury reasonably to infer that "an action of the victim trigger[ed] a sudden loss of self-control in the defendant").  Neither the surveillance footage nor witness testimony demonstrates that the victim assaulted Sunsin. Although the defendant continues to rely heavily on Diaz's testimony, where Diaz never identified the victim as being involved in the actual physical altercation, such an inference would be nothing more than speculation.  See Commonwealth v. Masello, 428 Mass. 446, 450 (1998) (no instruction warranted where only "scant evidence that the victim had attacked the defendant or struck any blows"); Gonzalez, 465 Mass. at 686 (no provocation instruction where defendant physically struggled with family and friends of victim, but contention that victim took part in altercation was "mere speculation").

The defendant alternatively contends in a footnote that even if the victim was not involved in the fray, the jury could

have found him guilty of manslaughter if he accidentally shot the victim while attempting to shoot Rodriguez or another melee participant.  He grounds this argument in a footnote in LeClair, 445 Mass. at 743 n.3, citing W.R. LaFave & A.W. Scott, Jr., Criminal Law § 76, at 582 (1972), in which we stated that "[c]ommentators also observe that, in circumstances where one (A) who is reasonably and actually provoked by another person (B) into a passion to kill B, shoots at B but accidentally hits and kills an innocent bystander, A's crime is voluntary manslaughter."  Although we agree with this general proposition, it has no applicability to the present case.  Here, the defendant inflicted two fatal shots on the victim not accidentally during the melee, but intentionally after it ended, while the victim lay on the floor, wounded and unarmed.  The judge did not abuse his discretion in refusing to give the requested instructions.

5.  Ineffective assistance of counsel.  The defendant also contends that defense counsel rendered ineffective assistance by misapprehending the strength of the Commonwealth's case. Specifically, he argues that defense counsel mistakenly advised him against accepting a plea to murder in the second degree as a direct result of defense counsel's insufficient review of certain items provided in discovery.

To prevail on an ineffective assistance of counsel claim a defendant must demonstrate "serious incompetency of counsel (behavior falling measurably below that which might be expected from an ordinary fallible lawyer) and prejudice that, in this context, means a 'reasonable probability' that 'but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Commonwealth v. Mahar, 442 Mass. 11, 15 (2004), quoting Strickland v. Washington, 466 U.S. 668, 694 (1984). To demonstrate that ineffective assistance of counsel caused prejudice in the context of a plea deal, a defendant "must show the outcome of the plea process would have been different with competent advice." Lafler v. Cooper, 132 S. Ct. 1376, 1384 (2012). Moreover, G. L. c. 278, § 33E, provides a "standard . . . that is more favorable to a defendant than is the constitutional standard for determining ineffectiveness of counsel" (quotation and citation omitted). Commonwealth v. Britto, 433 Mass. 596, 601-602 (2001).

The defendant first claims that defense counsel underestimated the Commonwealth's case by failing to review the club's surveillance footage before closing argument. At the hearing on the motion for a new trial, defense counsel answered affirmatively when asked if he "essentially" saw the surveillance footage for the "first time" during closing argument. However, defense counsel also explained, "I had not

seen some of the things that [the prosecutor] pointed out while doing his closing argument.  He used the video and I [had] seen the video twice, but I did not see what he was pointing out prior to his doing so."[20]

Additionally, at trial, when the still images of the surveillance footage were entered as exhibits, defense counsel explicitly stated several times that he had seen all of them.  Specifically, he said, "Yes, I did look at [the still photographs] this morning and I've seen them before . . . .  Like I say, I've seen them all before."  Further, he stated, "I've seen all of these photos and I've seen the videos . . . ."  Therefore, it appears that defense counsel did not mean to suggest that he literally had not viewed the footage prior to closing argument but, rather, that only then did he see how the Commonwealth intended to use it in support of its position.

The defendant next claims that defense counsel failed to review Diaz's video statement taken on the night of the shooting meaningfully.  At trial, defense counsel stated that he did not view this statement until the night before Diaz's cross-examination.[21]  Although defense counsel certainly should have

---

[20] Even the judge noted that there was something "powerfully persuasive about the manner in which [the prosecutor] interspersed his oral argument with scenes from the video."

[21] The record suggests that defense counsel most likely received the video on a disk from the Commonwealth, but either

reviewed Diaz's statement in a more timely fashion, any delay was mitigated by the fact that he did view it and was therefore able to adequately prepare and conduct an effective cross-examination.  See Commonwealth v. Wadlington, 467 Mass. 192, 201 (2014) (failure to review witness's video statement until eve of trial not ineffective assistance as counsel effectively used prior inconsistency contained in video statement during cross-examination).  Indeed, before Diaz's cross-examination began defense counsel stated, "As a matter of fact [Diaz] sa[id] already what I thought and what I had hoped that he would say. . . ."  Moreover, Diaz's video statement was largely consistent with his grand jury testimony, which defense counsel had reviewed.[22]  Therefore, it is unlikely that viewing the video any earlier would have altered defense counsel's strategy.

Ultimately, the defendant contends that had defense counsel properly reviewed all of the evidence, he would have realized a murder in the first degree conviction was likely and therefore would have advised the defendant to accept the plea deal.  In

---

misplaced it or was unable to view it.  Nevertheless, the judge acknowledged this issue and ensured that defense counsel would have an opportunity to view the video and adequately prepare for cross-examination.

[22] The defendant does not assert that Diaz's grand jury testimony differed significantly from his video statement, but stresses that the video had the "impact" of showing Diaz on the night of the murder.

ruling on the defendant's motion for a new trial, the judge concluded that defense counsel's "advice to reject the Commonwealth's offer of a second-degree murder plea bargain was not unreasonable," and we agree with this assessment.[23]  Diaz's testimony was essential to convict the defendant of murder in the first degree, as he was the only person who testified to seeing the defendant shoot the victim twice while the victim lay on the floor.  At the time defense counsel advised the defendant not to accept the Commonwealth's plea deal, it was uncertain whether Diaz (who had fled to another country) would testify, and, if so, whether he would cooperate[24] and whether he would be credible.  Indeed, the day before the trial began the Commonwealth moved for a continuance because the extradition process, which was not then complete, could have taken up to two

---

[23] As the judge who heard the motion for a new trial was also the trial judge, his findings "are entitled to substantial deference," as he observed counsel's effectiveness first-hand. See Commonwealth v. Britto, 433 Mass. 596, 608 (2001).  See Commonwealth v. DeVincent, 421 Mass. 64, 69 (1995).

[24] Diaz fled to Spain because of an unrelated drug trafficking charge, and it took what the Commonwealth described as a "Herculean effort" (including the involvement of the State Police, the United States Justice Department, and the United States Marshals) to get him back to Massachusetts to testify. Once Diaz was back, it was still uncertain whether he would cooperate.  The Commonwealth stated at the new trial hearing:

"[Diaz] arrived and even on his arrival, I wasn't sure what we were going to get. . . .  I didn't expect him to be a cooperative witness.  So there was always the very strong possibility that we were not going to get Danny Diaz in."

additional months.  Accordingly, on the record before us,
defense counsel's inability to recognize fully the strength of
the Commonwealth's case until after Diaz testified was
understandable[25] and his advice to reject the murder in the
second degree plea, when it was available,[26] was not ineffective.
See Mahar, 442 Mass. at 17, quoting In re Alvernaz, 2 Cal. 4th
924, 937 (1992) ("defense attorney's simple misjudgment as to
the strength of the prosecution's case . . . will not, without
more, give rise to a claim of ineffective assistance of
counsel").

6.  Closing argument.  Last, the defendant argues that the
Commonwealth's closing argument improperly appealed to the
sympathies of the jury.  Specifically, he contends that the

---

[25] The defendant also argues that defense counsel should
have advised him to accept the plea deal once it was clear (on
the seventh day of the trial) that Diaz was going to testify.
However, as previously mentioned, at that point it was still far
from obvious that Diaz would be a cooperative witness.  In fact,
when ruling on the defendant's motion for a new trial, the judge
stated, "Diaz was . . . a problematic witness for the
government.  It was highly uncertain that he would ever appear;
and that, if he did, he would be willing to testify."

Moreover, at the time Diaz was to testify, he faced a
fifteen year mandatory minimum term of imprisonment on charges
of drug trafficking.  Defense counsel aggressively cross-
examined Diaz on the agreement he had with the district
attorney's office with respect to reducing those charges and any
prospective sentence.

[26] After Diaz testified, the Commonwealth no longer offered
the defendant an option to plead guilty to murder in the second
degree.

Commonwealth used hyperbolic language to urge the jury to convict, excessively referred to the shooting as an "execution," improperly invited the jury into the victim's position in an attempt to arouse sympathy, and included unnecessary references to the scene's gore.[27]  As the defendant did not object to these statements at trial, we review for a substantial likelihood of a miscarriage of justice.  See Commonwealth v. Scott, 470 Mass. 320, 333-334 (2014).  Additionally, "[w]e review the prosecutor's remarks in the context of his entire closing argument, the judge's instructions to the jury, and the evidence produced at trial."  Commonwealth v. Lyons, 426 Mass. 466, 471 (1998).

The Commonwealth tried this case on a theory of extreme atrocity or cruelty.  Therefore, in contrast to what the defendant submits, the degree of the defendant's guilt was not the only issue at trial, and the Commonwealth was entitled to focus the jury "both on the defendant's actions, in terms of the manner and means of inflicting death, and on the resulting effect on the victim" (citation omitted).  Commonwealth v.

_____

[27] For example, the Commonwealth stated in closing:  "That bump on the ground is the body of twenty-eight-year-old Jeffrey Santiago lying face down on beer-stained, dirty barroom floor, seconds or minutes left to live.  Dying in pain and dying in agony.  And there is his cowardly killer, just steps away, happy in the deed he had just performed, dispensing of [the victim's] life with the ease and convenience of dispensing of a piece of garbage on the floor."

Barros, 425 Mass. 572, 581 (1997).  The Commonwealth was permitted to call the jury's attention to the "defendant's awareness of, but indifference to, or pleasure in, the victim's suffering," id., as "[w]here a charge of murder in the first degree is based on the theory of extreme atrocity or cruelty . . . the jurors serve as the conscience of the community in determining whether the killing merits that description." Commonwealth v. Torres, 437 Mass. 460, 465 (2002).  In such circumstances, the Commonwealth may "illustrate the magnitude of the crime" by discussing the details of the victim's death, as well as the elements of gore and pain that are not inherent in every death.  See Commonwealth v. Siny Van Tran, 460 Mass. 535, 554 (2011).  See also Commonwealth v. Wilson, 427 Mass. 336, 351 (1998) (prosecutor's references to gruesomeness of crimes not improper because relevant to issue whether defendant's actions constituted extreme atrocity or cruelty).  Moreover, "enthusiastic rhetoric, strong advocacy, and excusable hyperbole are not grounds for reversal" (quotation and citation omitted). Wilson, 427 Mass. at 350.

Still, although it was permissible for the Commonwealth to call the jury's attention to the circumstances of the victim's death, namely that he lay bleeding on a dirty barroom floor while the man who fatally shot him ran away, laughing, we agree that some of the Commonwealth's closing remarks overstepped the

bounds of appropriate rhetoric.  For example, the Commonwealth offered the following description of the crime scene:

> "[T]here was another scent at that crime scene.  The smell of blood.  The smell of three people's blood, all at his hand.  A blood pool, a puddle of blood . . . seeping out of [the victim's] body as his life seeped out of his body . . . [the victim's] life literally drained from his body."

Additionally, the Commonwealth implored the jury:

> "Think about landing face down on that dirty, beer-stained barroom floor.  You are completely helpless . . . you're laying there bleeding, in pain, in terror. . . .  Think about the last moments of [the victim's] life, whether he lived for seconds, as the doctor told you, or lived for minutes, it was a horrible, brutal, vicious death. . . . The pain, the suffering."

These remarks, attempting to arouse sympathy and invite the jury into the victim's position, were improper.  See Commonwealth v. Olmande, 84 Mass. App. Ct. 231, 234 (2013).

The defendant also properly takes issue with the Commonwealth's reference to the shooting as an execution no fewer than eleven times.  To be sure, the Commonwealth could, given the evidence, permissibly label the victim's shooting an execution.  See Commonwealth v. Francis, 450 Mass. 132, 141 (2007) (phrase "execution-style" described shooting appropriately given that victim was shot several times in back).  However, rather than making just a "few passing references," see Wilson, 427 Mass. at 351, the Commonwealth appears to have dwelled gratuitously on the circumstances of the murder in order to appeal to the jury's sympathy.  See Commonwealth v. Santiago,

425 Mass. 491, 494-495 (1997), S.C., 427 Mass. 298, and S.C., 428 Mass. 39, cert. denied, 525 U.S. 1003 (1998) (prosecutor acted improperly when, in closing, stated seven times that victim of fatal shooting was pregnant and four times that her birthday was day after shooting).

However, given that the Commonwealth charged the defendant with extreme atrocity and cruelty, and in the context of the entire summation, the evidence at trial, and the jury instructions, see Commonwealth v. Viriyahiranpaiboon, 412 Mass. 224, 231 (1992), these errors did not create a substantial likelihood of a miscarriage of justice. See Wilson, 427 Mass. at 351. First, the prosecutor explicitly stated that the reason for dwelling on the manner of death was to explain that the murder was conducted with extreme atrocity or cruelty.[28] In addition, the lack of objection by defense counsel, although not dispositive, is indicative that the tone and manner of the remarks were not unfairly prejudicial. Sanchez, 405 Mass. at 375. Moreover, "[a]ny adverse impact . . . resulting from the

---

[28] The Commonwealth even explained to the jury in closing, "I don't tell you all this to shock you. I don't tell you this to upset you. I tell you this because it's important. It's important to know how [the victim] died. It's important to know how much callousness and indifference was executed by the man who killed him on that barroom floor. It's important to know that [the victim] suffered, because as you'll soon know from [the judge's] instructions, his suffering, the way he was killed, it screams a concept called extreme atrocity. It screams cruelty."

summation would have been cured by the judge's charge to the jury." Commonwealth v. Costa, 414 Mass. 618, 629 (1993). Although none of the errors was addressed specifically, the judge instructed the jury that closing arguments are not evidence and that the jury were not to be swayed by emotion, sentiment, sympathy, or prejudice.[29] "The jury have the ability to discount hyperbole and other improper statements, . . . and trial judge's instructions are generally adequate [to] cure errors in the arguments" (citation omitted). Santiago, 425 Mass. at 495.

7. Review pursuant to G. L. c. 278, § 33E. We have reviewed the entire record of the defendant's trial pursuant to G. L. c. 278, § 33E, and find no reason to exercise our authority to reduce the jury's verdict of murder to a lesser degree of guilt or order a new trial.

Judgments affirmed.

---

[29] Specifically, the judge explained: (1) "[y]ou must be completely impartial. You are not to be swayed by any emotion, sentiment, sympathy or prejudice"; (2) "[f]inal arguments of counsel . . . [a]re not evidence"; and (3) personal views of the attorneys, "as such views may have come through when they presented their final arguments" are not relevant.