SUPREME JUDICIAL COURT 
 
 COMMONWEALTH vs. SHONDELL Q. RATEREE

 
 Docket:
 SJC-13599
 
 
 Dates:
 October 11, 2024 - April 8, 2025
 
 
 Present:
 Budd, C.J., Gaziano, Kafker, Wendlandt, Georges, Dewar, & Wolohojian, JJ.
 
 
 County:
 Barnstable
 

 
 Keywords:
 Assault with Intent to Maim. Mayhem. Assault and Battery by Means of a Dangerous Weapon. Assault and Battery. Misleading a Police Officer. Self-Defense. Evidence, Prior violent conduct, Relevancy and materiality, Intent. Intent. Practice, Criminal, Instructions to jury, Duplicative convictions, Lesser included offense.
 
 

             Indictments found and returned in the Superior Court Department on November 18, 2019.
            The cases were tried before Mark C. Gildea, J.
            The Supreme Judicial Court granted an application for direct appellate review.
            Nancy Dolberg, Committee for Public Counsel Services, for the defendant.
            Rose-Ellen El Khoury, Assistant District Attorney (Robert J. Galibois, District Attorney for the Cape and Islands District, also present) for the Commonwealth.
            WOLOHOJIAN, J.  As a result of an early morning altercation involving a woman and three men (one of whom was the defendant, another of whom was a codefendant, and the third being the victim), the defendant was convicted by a jury of assault with intent to maim, G. L. c. 265, § 15; mayhem, G. L. c. 265, § 14; assault and battery by means of a dangerous weapon (knife) causing serious bodily injury, G. L. c. 265, § 15A (c) (i); assault and battery by means of a dangerous weapon (shod foot), G. L. c. 265, § 15A (b); two counts of assault and battery, G. L. c. 265, § 13A (a); and misleading a police officer, G. L. c. 268, § 13B.[1]  In this direct appeal from his convictions, the defendant raises three issues.  First, he argues that the trial judge abused his discretion in excluding so-called Adjutant evidence[2] where he claimed both self-defense and defense of another and the identity of the person who first used deadly force was in dispute.  Second, the defendant argues that the evidence was insufficient to support his conviction of misleading a police officer where there was no evidence of specific intent beyond his mere exculpatory "no" in response to the officer's question.  Third, the defendant asserts that his convictions of assault with intent to maim and assault and battery by means of a dangerous weapon causing serious bodily injury are duplicative of his conviction of mayhem, and that one of his assault and battery convictions is duplicative of his conviction of assault and battery by means of a dangerous weapon.  
            We conclude that the defendant has not shown that the judge abused his discretion in excluding the Adjutant evidence in connection with the defendant's self-defense claim, and we decline in this case to extend the Adjutant rule to defense of another.  We further conclude that there was insufficient evidence of the defendant's specific intent to support the conviction of misleading a police officer, that the convictions of assault with intent to maim and assault and battery by means of a dangerous weapon causing serious bodily injury are duplicative of the mayhem conviction, and that one of the convictions of assault and battery is duplicative of the conviction of assault and battery by means of a dangerous weapon.  Accordingly, we vacate the defendant's convictions of misleading a police officer, assault with intent to maim, assault and battery by means of a dangerous weapon causing serious bodily injury, and one count of assault and battery.  The remaining convictions are affirmed, and the matter is remanded to the Superior Court for resentencing.  
            Background.  1.  Facts.  We begin with a broad outline of the evidence, reserving additional details to our later discussion of the issues to which they relate.  On September 7, 2019, Tyla Marceline went out with a friend named Brandy Bernier, ultimately ending up at a fast food restaurant at around midnight.  At some point during the evening, Marceline contacted the defendant, who was also a friend, and asked him to meet her and Bernier at the restaurant.  The defendant agreed, and drove to the restaurant with a friend of his, the codefendant, who was unknown to Marceline and Bernier.  By this point, Marceline had had "a lot" to drink and was extremely intoxicated.
            After spending some time at the restaurant, the defendant drove Marceline and the codefendant to Bernier's house, and Bernier drove to the same location separately.  Marceline and Bernier then had an argument, and Marceline asked the defendant to drive her home to Hyannis, which he agreed to do.  Marceline lived in Hyannis with her boyfriend Christopher Griffiths (the victim), her mother, her grandmother, and her grandmother's boyfriend.
            On the drive to Hyannis, Marceline repeatedly insisted that she did not want to remain in the car and that she wished to be let out.  The defendant stopped the car in the parking lot of a convenience store located at the Bourne rotary at approximately 2:30 A.M.  He got out of the car and engaged the child safety lock on the rear passenger's side door, where Marceline was seated, in order to prevent her from leaving.[3]  The defendant then continued toward Marceline's house.  Marceline called her grandmother and Griffiths, who heard Marceline screaming that she was locked in the car and that the defendant and codefendant would not let her out.
            Not long thereafter, the group arrived at Marceline's house.  It was undisputed that a brief and violent melee erupted almost immediately thereafter involving the defendant, the codefendant, Marceline, and Griffiths, and that all four participants suffered knife wounds, with Griffiths's being the most serious and extensive, and nearly fatal.[4]  The details of the conflict, however, differed depending on who recounted them, and because those differing accounts are significant to our analysis, we set out them out separately.   
            Griffiths testified that he approached the car to release Marceline from the back seat.  Griffiths exchanged words with the defendant and codefendant about their treatment of Marceline.  After Griffiths opened the door to let Marceline out, the defendant walked around the car, grabbed Marceline by her hair, and dragged her along the ground.  When Griffiths again verbally confronted the defendant, telling him to take his hands off Marceline, the defendant struck Griffiths on the forehead with an open hand.  At this time, Griffiths heard the codefendant get out of the car to come up behind him.  Griffiths then punched the defendant in the eye.  The defendant and codefendant then dragged Griffiths by his two-foot-long dreadlocks while kicking and punching him.  Marceline then grabbed the codefendant, toppling him to the ground.  At this point, Griffiths, Marceline, and the codefendant were on the ground, while the defendant remained standing above them.  Griffiths heard the defendant open a knife and then felt himself being stabbed.  The knife fell to the ground, and a general struggle over control of the knife ensued.  Ultimately, the defendant regained control of the knife, and he and the codefendant returned to the defendant's car and drove off.
            Marceline testified that she had little recollection of the conflict, apart from Griffiths on the ground screaming for help while the defendant and codefendant kicked and punched him.  The next thing she remembered was a police officer holding her leg and telling her that she had been stabbed.
            Marceline's mother testified that she saw the defendant and codefendant arrive at the house and that the codefendant pulled Marceline from the car by her hair.  Although the mother observed the subsequent fight, she did not see "who did what to who."  Marceline's mother's friend testified that he heard Griffiths shouting that he had been stabbed.  
            Neither the defendant nor the codefendant testified at trial.  However, videotapes and transcripts of their interviews with police conducted on the day of the conflict were admitted.  The defendant was interviewed twice:  first at the hospital, and then at the station.  During the first interview, the defendant denied having any recollection of the evening, claimed not to know how he had been stabbed, denied knowing the codefendant, and denied, or claimed to have no recollection of, any other details about which he was questioned.
            During his second interview, the defendant was more forthcoming.  He confirmed the events of the earlier part of the evening.  He said that Marceline refused to leave the car when they arrived at her house, and so he asked Griffiths to remove her from the car.  He and Griffiths then exchanged words.  The codefendant then "hopped" out of the car.  Marceline attacked the defendant, pulling his hair and throwing him down on the ground.  A "rumble" then started, but the defendant did not know who was hitting whom.  Within moments, Marceline held the codefendant while Griffiths stabbed him repeatedly.[5]  The codefendant screamed for the defendant, saying that he was being "poked."  The defendant was at that point standing off to the side, "getting a breather."  Although the defendant denied stabbing Griffiths, and claimed not to know how Griffiths or Marceline became injured, he acknowledged that he "probably hit" Griffiths.  The defendant also said, "I know this is bad.  I know that – I know I'm, I know I'm – I know I, I know I fucked up.  But I had to defend myself."  
            The codefendant's version of events, as he recounted them to police, was that he had come alone to Cape Cod from Fall River, using a rideshare service, for the purpose of sightseeing.  While walking along a street by himself, an unknown man attacked him with a knife.  He grabbed the knife by the blade, which resulted in injuries to his hand.  He denied knowing anything further, including how he had come to the hospital. 
            We now return to the timeline of events.  In response to Marceline's mother's 911 telephone call, police were dispatched to the scene of the altercation at 2:54 A.M., by which time the defendant and the codefendant had fled.  Security video footage from Cape Cod Hospital showed the defendant's car arriving just before 3:01 A.M., when he dropped the codefendant off at the emergency room.  At 3:02 A.M., the defendant's car left the hospital, going in the direction of nearby Bay View Beach in Yarmouth.  At the same time, a Yarmouth dispatcher, having heard that there had been a stabbing in Hyannis, was monitoring the town's surveillance cameras and observed a sedan stop in the middle of the Bay View Beach parking lot.  He saw the driver walk toward the water and throw an object in.  The Yarmouth dispatcher conveyed this information to a Barnstable dispatcher a few minutes later.
            At 3:04 A.M., the defendant called his girlfriend and asked her to meet him at Cape Cod Hospital.  The girlfriend did so, and then used her own car to drive the defendant to her home about five minutes away.  The girlfriend then observed that the defendant had a stab wound in his back and drove him back to the hospital.
            Later that morning, police searched Bay View Beach at low tide and found a folding knife about fifty feet offshore, which the defendant acknowledged was his during his second interview with police.  Police found no other knives, either around the area of the altercation or during a search of Marceline's house shortly after the altercation.
            2.  Procedural history.  The defendant moved in limine to admit Adjutant evidence.  More specifically, the defendant wished to examine Marceline and to cross-examine Griffiths concerning an incident in 2017 (i.e., two years before the altercation at issue in this case) for which Griffiths had been arrested and charged with assault and battery by means of a dangerous weapon (knife).  The defendant argued that the evidence of this prior incident should be admitted given that "Griffiths initiated the altercation by first using a knife to attack [the codefendant]."  The motion was accompanied by a police report from the 2017 incident, which indicated that Marceline and Griffiths had had an argument during a party at Marceline's apartment.  When Griffiths threatened to break a dish over Marceline's head, another man came to Marceline's defense and tackled Griffiths to the ground.  Griffiths left.  One-half hour later, when Marceline and the man were leaving the apartment, Griffiths struck the man in the neck with a knife causing a superficial wound.
            The judge took the motion up at numerous times during the course of the trial.  We need not lay out here the complete details of the judge's detailed, repeated, and thorough exploration of the Adjutant issue.  Instead, we recount only those portions that are pertinent to our analysis.  The judge first allowed defense counsel to conduct a voir dire examination of Marceline concerning the 2017 incident.  Marceline in essence testified to the contents of the police report, adding only that Griffiths and the man engaged in a fist fight before Griffiths pulled out a knife and that the wound was a "scratch."  At the conclusion of the voir dire, the judge stated a tentative view that the defendant would be permitted to elicit testimony regarding the 2017 incident.  In light of that ruling, the prosecutor moved to introduce rebuttal evidence of (1) the defendant's prior conviction for armed robbery with a knife, (2) the defendant's prior conviction for assaulting another inmate at a correctional facility, as well as a video recording of that assault, and (3) the codefendant's prior conviction for domestic abuse.  The judge deferred making a final ruling on either motion.
            Several days later, argument on the motions resumed.  The judge expressed the view that he did not think that the evidence concerning Griffiths holding a plate over Marceline's head was the type of prior violence about which Adjutant was concerned.  Ultimately, the judge announced that if there was evidence of self-defense at trial (at this point, the judge had not yet heard or seen the evidence of the defendant's and codefendant's interviews with police),[6] then evidence of the 2017 incident would come in for its "very limited purpose" under Adjutant.  The judge also announced that, although he would exclude evidence of the prison assault on the ground that it was overly prejudicial, he would permit the Commonwealth to introduce rebuttal evidence of the defendant's conviction for armed robbery with a knife and of the codefendant's domestic violence conviction.  
            On the eighth day of trial, the judge was required to suspend the trial for a week due to defendant's counsel contracting COVID-19.[7]  The judge used the one-week suspension to again consider the admission of Adjutant evidence.  The judge read the transcripts of the police interviews,[8] and then informed the parties that the evidence concerning whether Griffiths was the first aggressor was different from what he had previously believed.  The judge deferred further argument on the Adjutant motions until defense counsel could return to court in person.  
            Further argument on the motions took place on the next two days of trial.  On the first of those days, the judge acknowledged that there was evidence that Griffiths initiated deadly force.  However, the judge said that he was "not inclined" "given the state of the record at this time" to permit the proffered Adjutant evidence, but that the ruling was subject to revisitation should the defendant and codefendant choose to testify.  The judge also alerted the prosecutor that releasing the Commonwealth's proposed rebuttal witnesses would be at her peril.
            Argument concerning the Adjutant evidence resumed the following day.  The judge stated his view that the defendant's and codefendant's statements to police did not raise a dispute over whether Griffiths initiated the fight because the defendant identified Marceline as the first aggressor and the codefendant offered no version of the events.  The argument then turned to the prosecutor's contention that the Adjutant doctrine did not extend to defense of another.  Defendant's counsel not only disagreed with this position, but also pointed out that he was asserting a self-defense claim as well as defense of another.  
"Yes, it's [defense of another], but at some point isn't it also self-defense, because you have a knife-wielding man right there with you, right there next to you, perhaps now close to, within two feet, within six feet.  You know, I know there's a duty to retreat which, again, is very nice to say in retrospect, but this was a brawl, and there's not a whole lot of time for reflection."  
The prosecutor acknowledged that the defendant was entitled to raise self-defense.
            Ultimately, the judge concluded that under his understanding of the law, "Adjutant evidence is not relevant to defense of another.  And maybe the SJC is going to extend it someday, but I'm not going to."  The judge stated that if the defendant sought to introduce the proffered Adjutant evidence, he would sustain the Commonwealth's objection to it.
            Neither the defendant nor the codefendant sought to introduce evidence of the 2017 incident during the remainder of the trial.[9]  Nor did either testify.  In his closing argument, the defendant's theory of the case was that the defendant had locked Marceline in the car merely for her own safety and that he had at all times acted in self-defense as well as in defense of the codefendant.  Counsel argued that Marceline began the conflict by attacking the defendant, and that she later restrained the codefendant while Griffiths stabbed him.  Although the defendant did not admit to using a knife during the altercation, defense counsel acknowledged that the jury could infer he had done so given that he threw his knife into the water shortly after the fight.  Defense counsel leaned heavily on the fact that all four participants received stab wounds, which he argued undermined the credibility of Griffiths's version of events.
            The judge instructed the jury on self-defense as well as on defense of another.  Ultimately, the defendant was convicted of assault with intent to maim, G. L. c. 265, § 15; mayhem, G. L. c. 265, § 14; assault and battery by means of a dangerous weapon causing serious bodily injury, G. L. c. 265, § 15A (c) (i); assault and battery by means of a dangerous weapon, G. L. c. 265, § 15A (b); two counts of assault and battery, G. L. c. 265, § 13A (a) (one relating to Marceline, one to Griffiths); and misleading a police officer, G. L. c. 268, § 13B.  The defendant filed a timely notice of appeal, and we allowed his application for direct appellate review.
            Discussion.  1.  Adjutant evidence.  The defendant argues that the judge erred in excluding evidence of Griffiths's prior violent act in 2017, which occurred two years before the altercation in this case.  In Commonwealth v. Adjutant, 443 Mass. 649, 664 (2005), we adopted a new common-law rule of evidence that "where the identity of the first aggressor is in dispute and the victim has a history of violence, . . . the trial judge has the discretion to admit evidence of specific acts of prior violent conduct that the victim is reasonably alleged to have initiated, to support the defendant's claim of self-defense."  This new rule did not "alter the rule against the admission of hearsay evidence" but "merely permitted the admission of evidence that previously had been deemed irrelevant."  Commonwealth v. Deconinck, 480 Mass. 254, 266-267 (2018), quoting Commonwealth v. Clemente, 452 Mass. 295, 306 n.18 (2008), cert. denied, 555 U.S. 1181 (2009).  Adjutant serves as "one of the few narrow exceptions to the general bar on propensity evidence."  Commonwealth v. Souza, 492 Mass. 615, 616 (2023).
            A predicate to admission of Adjutant evidence is that there be a dispute concerning whether the victim was the first to initiate physical conflict or the first to use deadly force.  See Commonwealth v. Camacho, 472 Mass. 587, 591-593 (2015).  Once that fact-based predicate is met, the judge may, as a general rule, admit not only evidence of the victim's prior acts of violence, but also "evidence (if it exists) of specific violent acts of the defendant.  This approach serves the goal of providing the jury with 'as complete a picture of the (often fatal) altercation as possible before deciding on the defendant's guilt.'"  Commonwealth v. Morales, 464 Mass. 302, 310 (2013), quoting Adjutant, 443 Mass. at 658-659.  For similar reasons, prior violent acts of a third party may be admitted if the judge determines that, taking the evidence in the light most favorable to the defendant, "the third party was acting in concert with or to assist the victim" during the confrontation with the defendant.  Commonwealth v. Pring-Wilson, 448 Mass. 718, 737 (2007).
            Because Adjutant evidence "is propensity evidence 'admitted expressly for the purposes of showing that the victim acted in conformance with his or her character for violence, there is a risk both of prejudice and of misunderstanding on the jury's part as to the purpose of its admission'" (quotation and alterations omitted).  Souza, 492 Mass. at 623, quoting Morales, 464 Mass. at 307.  For this reason, "[i]t is for the trial judge to evaluate the proffered evidence's probative value and admit so much of that evidence as is noncumulative and relevant to the defendant's self-defense claim."  Adjutant, 443 Mass. at 663.  The judge should also instruct the jury on the limited purpose for which the evidence is being admitted.  See Souza, 492 Mass. at 633-634.
      We begin by addressing the judge's determination that the proffered evidence was not relevant because there was no dispute as to whether Griffiths initiated the altercation.  The judge was clearly correct on this point because there was no evidence to suggest that Griffiths was the first aggressor of the conflict.  The defendant told police that Marceline was the first to engage in physical combat –- not Griffiths.  To the extent the defendant's version of events differed from Griffiths's testimony that the defendant initiated the fight by dragging Marceline by her hair, that is not the kind of dispute that fits into "the narrow framework . . . that Adjutant posits," Camacho, 472 Mass. at 594, quoting Morales, 464 Mass. at 310 n.13, because evidence of Griffiths's prior violent conduct was not relevant to resolve the identity of the first aggressor where there was no evidence to suggest that he was that person.  
            The judge was also correct that, taking the evidence in the light most favorable to the defendant, there was a dispute concerning the identity of the person who first escalated the conflict by using deadly force.  Griffiths testified that the defendant was the first to use deadly force by stabbing him after he was toppled to the ground with Marceline and the codefendant.  By contrast, the defendant's version of events was that Griffiths was the first to use deadly force by stabbing the codefendant while the latter was restrained by Marceline.  Although it is true that the defendant never admitted to stabbing Griffiths, his admission was not necessary given the ample other direct and circumstantial evidence bearing on that point.  Here, regardless of the absence of testimony from the defendant, the evidence raised a sufficient factual dispute as to whether the victim was the first to escalate the conflict by using deadly force and, accordingly, the predicate showing required by Adjutant was met.  See Commonwealth v. Toon, 55 Mass. App. Ct. 642, 650-651 (2002) (although elements of self-defense are "most often, and most easily, raised by direct evidence in the form of the defendant's testimony . . . , a defendant is not required to testify or to present any evidence and may rely entirely on the Commonwealth's case" and reasonable inferences to be drawn from it).  
            Nonetheless, the judge retained discretion to exclude the Adjutant evidence even though the factual predicate for its admission had been satisfied.  We will uphold a judge's decision to admit or exclude proffered Adjutant evidence "unless we find an abuse of discretion," Adjutant, 443 Mass. at 663 n.18, which occurs only where a judge commits "a clear error of judgment in weighing the facts relevant to the decision, . . . such that the decision falls outside the range of reasonable alternatives," Souza, 492 Mass. at 626, quoting Deconinck, 480 Mass. at 264.
            Here, the judge did not explicitly state the reasons for his decision to exclude the Adjutant evidence insofar as it was connected to the defendant's claim of self-defense.  The defendant argues that the judge's silence indicates that the judge incorrectly believed that the defendant was raising only defense of another.  This argument is belied by the fact that the judge instructed the jury on self-defense.  The judge instructed the jury that self-defense applied to, among other crimes, the charges of assault with intent to murder, assault with intent to maim, assault and battery by means of a dangerous weapon, and assault and battery by means of a dangerous weapon causing serious bodily injury.
            Turning to the exercise of the judge's discretion in excluding the Adjutant evidence in connection with the self-defense claim, the record is clear that the judge repeatedly and thoughtfully evaluated the competing concerns of admitting the evidence as well as the applicable law.  It is also clear that his evaluation of those competing considerations evolved over the course of the trial as the evidence developed.  Indeed, the judge himself explained that his initial views of the matter changed as he better understood the evidence bearing on the identity of the first aggressor and the person who initiated deadly force.  Therefore, in order to determine whether the judge committed an abuse of discretion, we look to the circumstances as they existed at the time the judge made his ultimate ruling.  
            On the one hand, as the judge recognized, the proffered evidence had probative value given the similarity of the conduct involved and its rough temporal proximity.  On the other hand, admission of the Adjutant evidence opened the door to admission of both the defendant's and the codefendant's serious previous convictions.  Moreover, evidence of the 2017 incident would come in through Marceline, who would testify that it resulted in only a "scratch" and no conviction.  By contrast, the defendant's prior violent acts were more serious and had resulted in convictions.  Given the relatively marginal value of Marceline's anticipated testimony and the risk that the evidence would open the door to the defendant's prior violent conduct, the judge could consider the impact of having multiple new rebuttal witnesses called at the end of a lengthy (and unexpectedly extended) trial to offer testimony detrimental to the defendant when those witnesses would be called simply to offset a single line of examination the defendant wished to pursue by calling Marceline as an adverse witness.[10]  In addition, this was not a case where the Adjutant evidence was the only way for the jury to assess the validity or likelihood of the defendant's version of events.  Here, all four participants survived the conflict, and several percipient witnesses testified -- and were cross-examined -- about the altercation.  The jury were fully capable of assessing the defendant's and Griffiths's competing versions of events on the evidence before them, and it is difficult to see how admitting evidence of their respective prior violent conduct would make either version more likely.  "There [is] a greater danger that exclusion of . . . evidence concerning the victim's violent acts could prejudice the defendant" where "the evidence might offer the only way for a jury to assess the validity or likelihood of the defendant's account of what happened."  Camacho, 472 Mass. at 593, quoting Morales, 464 Mass. at 307.  In the circumstances, we discern no abuse of discretion in the judge's decision to exclude evidence of the 2017 incident in the context of the defendant's claim of self-defense.  See Deconinck, 480 Mass. at 263-264.
            Our analysis stands on somewhat different footing with respect to the judge's exercise of discretion in excluding the Adjutant evidence in connection with the claim of defense of another because the judge articulated his reason for excluding the evidence in that context.  Specifically, the judge concluded that this court had not yet extended the Adjutant rule to defense of another, and he declined to do so himself.  The judge correctly read our case law.  In Camacho, 472 Mass. at 588, we considered the admissibility of Adjutant evidence in a case where defense of another was at issue but self-defense was not.  We held that the trial judge did not err in excluding the evidence given that there was no dispute concerning the identity of the first aggressor.  Id. at 594.  We also, in a footnote, stated that "[o]ur decision in the Adjutant case is specifically limited to situations where the defendant claims self-defense" and "we decline to extend the Adjutant doctrine to cases involving defense of another in this case" (citation omitted).  Id. at 596 n.12.  Although this footnote was not necessary to the holding in Camacho, we cannot fault the judge's reading of it.
            We have also declined to extend Adjutant beyond the context of self-defense in two other cases.  In Commonwealth v. Benoit, 452 Mass. 212, 227-228 (2008), we were asked to extend the Adjutant rule to cases where the defendant raised provocation as a defense.  We declined to extend the rule at that time, stating that "[o]ur decision in the Adjutant case is specifically limited to situations where the defendant claims self-defense and the identity of the first aggressor is in dispute."  Id. at 228.  More recently, in a decision released after the trial in this case, we declined to extend Adjutant beyond self-defense in Commonwealth v. Ronchi, 491 Mass. 284, 300 (2023), where we were asked to extend the doctrine to a victim's propensity to make provocative statements.  In Ronchi, too, we repeated that "[o]ur decision in the Adjutant case is specifically limited to situations where the defendant claims self-defense" (citation omitted).  Id.  In short, the judge correctly understood that our case law has not extended the Adjutant rule to defense of another.  That said, none of our cases has yet squarely presented the question.
            The defendant accordingly argues that the judge was not foreclosed from extending Adjutant to defense of another and that the judge abused his discretion by not doing so.  Setting aside the question whether our cases sufficiently alerted the judge to the fact that he had discretion to extend Adjutant to cases involving defense of another such that the judge could be said to have committed an error of law in failing to recognize his discretion to so extend the doctrine, see Souza, 492 Mass. at 626 (failure to recognize discretion necessarily error of law), the defendant has failed to show an abuse of discretion in excluding the evidence for the same reasons we have already outlined in the context of self-defense.  
            Finally, the defendant asks that we now extend the Adjutant rule to defense of another, and the Commonwealth does not argue against such an extension.  Nonetheless, we decline to extend the doctrine at this time given the unpredictable consequences of introducing propensity evidence concerning multiple people (the victim, the defendant, and third parties to whose defense the defendant allegedly came), including the risks of confusion, misuse, prejudice, and diversion that such evidence may carry.  Although self-defense and defense of another are analytically closely intertwined, see Commonwealth v. Adams, 458 Mass. 766, 774 (2011); Commonwealth v. Martin, 369 Mass. 640, 650 (1976), we note that no other jurisdiction has yet extended the doctrine to the context of defense of another.  Moreover, in the years since we decided Adjutant, the minority of States that permit Adjutant-type evidence has decreased,[11] see Gibson v. State, 300 Ga. 494, 498 n.8 (2017); State v. Williams, 929 N.W.2d 621, 636 (Iowa 2019); State v. Armendariz, 2006-NMSC-036, ¶ 17, overruled on other grounds by State v. Swick, 2012-NMSC-018, and there appears to be no trend toward expanding the doctrine to other defenses.
            2.  Misleading a police officer.  The defendant argues that there was insufficient evidence to support his conviction of misleading a police officer under G. L. c. 268, § 13B.  The charge rested on the defendant's statements to police on September 8, 2023, during a twelve-minute interview from 7:38 A.M. to 7:50 A.M. at the hospital during which the following exchange took place:
Detective:  "Did you go to the water tonight?  Did you go down by the ocean at all?"
Defendant:  "Down by the ocean?"
Detective:  "Yeah?"
Defendant:  "Down by the ocean, down by the ocean, no."
Detective:  "The beach -"
Defendant:  "I don't -"
Detective:  "-- or anything like that?"
Defendant:  "I don't remember."
Detective:  "You don't remember -"
Defendant:  "I don't think so."
Detective:  "-- that?"
Defendant:  "I don't think so."
The Commonwealth contends that the defendant's answer, "Down by the ocean, down by the ocean, no," is sufficient to support the conviction of misleading a police officer.[12]  Taking the evidence, as we must, in the view most favorable to the Commonwealth, Commonwealth v. Latimore, 378 Mass. 671, 677 (1979), we disagree.
            General Laws c. 268, § 13B,[13] is "fundamentally a 'witness intimidation statute'" and is "concerned primarily with countering the effect of witness intimidation on the successful prosecution of criminals" (citation omitted).  Commonwealth v. Morse, 468 Mass. 360, 367 (2014).  The scope of the statute was expanded in 2006 to "outlaw[] 'mislead[ing]' and 'harass[ing]' conduct, in addition to the 'threaten[ing]' and 'intimidat[ing]' conduct that the prior version of the statute had proscribed."  Id. at 369, quoting G. L. c. 268, § 13B, as appearing in St. 2006, c. 48, § 3.  We are concerned here only with the "misleading" prong of the statute, which prohibits, in relevant part, directly or indirectly (1) willfully misleading (2) a law enforcement officer (3) "with the intent to . . . impede, obstruct, delay, prevent or otherwise interfere with . . . a criminal investigation."  G. L. c. 268, § 13B (b).  See Commonwealth v. Paquette, 475 Mass. 793, 797 (2016).  
            We have adopted the Federal definition of "misleading conduct" as used in the Federal witness tampering statute, 18 U.S.C. § 1512(b):
"(A) knowingly making a false statement; (B) intentionally omitting information from a statement and thereby causing a portion of such statement to be misleading, or intentionally concealing a material fact, and thereby creating a false impression by such statement; (C) with intent to mislead, knowingly submitting or inviting reliance on a writing or recording that is false, forged, altered, or otherwise lacking in authenticity; (D) with intent to mislead, knowingly submitting or inviting reliance on a sample, specimen, map, photograph, boundary mark, or other object that is misleading in a material respect; or (E) knowingly using a trick, scheme, or device with intent to mislead."
Commonwealth v. Figueroa, 464 Mass. 365, 372 (2013), quoting 18 U.S.C. § 1515(a)(3).
"Each aspect of the definition adopted suggests a knowing or intentional act calculated to lead another person astray.  Objectively misleading conduct, as defined, is not enough, however, to establish the offense.  In addition to the requirement that there be knowing or intentional conduct that is objectively misleading as defined, a statutory violation is not established unless there is also proof of a defendant's specific intent to 'impede, obstruct, delay, harm, punish, or otherwise interfere thereby' with a criminal investigation."[14] 
Morse, 468 Mass. at 372, quoting G. L. c. 268, § 13B (1) (c) (v), as appearing in St. 2006, c. 48, § 3.  
            Specific intent may be inferred "from a defendant's affirmative misrepresentations, plainly and demonstrably false, to law enforcement authorities."  Morse, 468 Mass. at 373.  "Where a defendant's statements satisfy the definition of misleading conduct, and there is sufficient evidence of his specific intent, 'it does not matter that [the defendant] fail[s] to succeed in misleading' his auditor."  Commonwealth v. Occhiuto, 88 Mass. App. Ct. 489, 504 (2015), quoting Figueroa, 464 Mass. at 373.  See Commonwealth v. Casiano, 70 Mass. App. Ct. 705, 709 (2007), quoting Commonwealth v. Robinson, 444 Mass. 102, 109 (2005) ("the statute punishes anyone who 'willfully endeavors' to intimidate a witness; it does not require that the intimidation be successful").
            The outcome here is controlled in all material respects by our decision in Morse, 468 Mass. at 374, where we concluded that the defendant's simple denial in response to a question asking whether he had consumed any impairing substances was merely "an exculpatory denial, not a content-laden fabrication designed to send police off course, thereby interfering with their investigation."  We held that, "[a]bsent additional evidence of specific intent, such exculpatory denials, standing alone, rarely will permit a reasonable inference that a defendant possessed the specific intent necessary to establish a violation of § 13B."  Id. at 374-375.  Contrast Paquette, 475 Mass. at 803-804 (defendant's statements "were more extensive than a simple exculpatory 'no'" and "were not the only evidence of his intent to interfere in some way with the police's investigation").  Such is the situation here, where the Commonwealth introduced no evidence of the defendant's specific intent beyond the defendant's simple exculpatory denial that he had gone to the ocean.
            3.  Duplicative convictions.  The defendant argues for the first time on appeal that his convictions of assault with intent to maim, G. L. c. 265, § 15, and assault and battery by means of a dangerous weapon causing serious bodily injury, G. L. c. 265, § 15A (c) (i), are duplicative of his conviction of mayhem, G. L. c. 265, § 14, and that one of his convictions of assault and battery, G. L. c. 265, § 13A (a), is duplicative of his conviction of assault and battery by means of a dangerous weapon, G. L. c. 265, § 15A (b), and should accordingly be vacated.[15]  The Commonwealth concedes that assault with intent to maim and assault and battery by means of a dangerous weapon causing serious bodily injury are lesser included offenses of mayhem, and that assault and battery is a lesser included offense of assault and battery by means of a dangerous weapon.[16]  
            A defendant generally may not be convicted of both a greater and a lesser included offense stemming from the same act.  Commonwealth v. Ortiz, 487 Mass. 602, 612 (2021).  However, convictions on both a greater and a lesser included offense are permitted where the convictions "rest on separate and distinct acts."  Commonwealth v. King, 445 Mass. 217, 225 (2005), cert. denied, 546 U.S. 1216 (2006).  The Commonwealth argues that the evidence in this case showed that the defendant committed "separate and distinct acts" sufficient to sustain all three lesser included offense convictions.[17]  We agree with this assessment of the sufficiency of the evidence.  Nonetheless, the convictions on the lesser included offenses must be vacated because the jury were not instructed or otherwise informed that the crimes were required to rest on separate and distinct acts.  
"Where . . . the judge does not clearly instruct the jury that they must find that the defendant committed separate and distinct criminal acts to convict on the different charges, the conviction[s] of the lesser included offense[s] must be vacated as duplicative, even in the absence of an objection, if there is any significant possibility that the jury may have based convictions of greater and lesser included offenses on the same act or series of acts."
Commonwealth v. Kelly, 470 Mass. 682, 700 (2015).  
            There is a significant possibility here that the convictions may rest on the same act or series of acts.  The charges stemmed from a brief and violent multiperson melee.  The jury were given no guidance at any point during the trial -- either by the prosecutor during closing argument or opening statement, or by the judge during his instructions, or by having the indictments before them[18] -- as to which specific acts were connected to each individual charge.  It matters not that the evidence could have permitted the jury to have associated individual and separate acts with each charge where the jury were never informed that that they should engage in that analysis and the evidence did not clearly suggest which act pertained to which indictment.  See Kelly, 470 Mass. at 700 (substantial risk of miscarriage of justice results from absence of specific unanimity instruction in case stemming from altercation).  Given this, the appropriate remedy is to "vacate both the conviction and sentence on the lesser included offense[s], and to affirm the conviction on the more serious offense."  Commonwealth v. Mello, 420 Mass. 375, 398 (1995). 
            Conclusion.  For the reasons set out above, the defendant's convictions of misleading a police officer, assault with intent to maim, assault and battery by means of a dangerous weapon causing serious bodily injury, and one count of assault and battery (indictment no. 19-110-08) are vacated.  The remaining convictions are affirmed, and the matter is remanded to the Superior Court for resentencing.
So ordered.

footnotes

            [1] The jury acquitted the defendant of assault with intent to murder, G. L. c. 265, § 15; conspiracy, G. L. c. 274, § 7; and kidnapping, G. L. c. 265, § 26.  The codefendant, who was similarly charged as the defendant, was convicted only of assault and battery by means of a dangerous weapon, G. L. c. 265, § 15A (b); and assault and battery, G. L. c. 265, § 13A (a).
            [2] Adjutant evidence refers to "specific acts of prior violent conduct that the victim is reasonably alleged to have initiated, to support the defendant's claim of self-defense" where the identity of the first aggressor is in dispute. Commonwealth v. Adjutant, 443 Mass. 649, 664 (2005).  See Mass. G. Evid. § 404(a)(2)(B) & note (2024).
            [3] The defendant's position at trial was that he engaged the child lock for Marceline's safety after she had opened the rear door while they were driving over the Bourne bridge.  Both the defendant and the codefendant were acquitted of kidnapping.  
            [4] Griffiths sustained three life-threatening stab wounds to his torso, leading him to lose forty percent of his blood; in addition, he received non-life-threatening stab wounds to his arm and leg.  A stab wound to Marceline's left leg severed her sciatic nerve.  Marceline was homebound for three and one-half months after the incident.  At the time of trial, she still did not have full movement or feeling in her leg and foot.  The codefendant suffered serious lacerations to his hands, requiring reconstructive surgery, and less serious stab wounds to his arm and leg.  The defendant received a black eye and a one-inch penetrating stab wound in his flank that was not severe because it did not penetrate the abdominal cavity.
            [5] During the same interview, the defendant also gave a slightly different account, that he and Griffiths were initially engaged in a fist fight.  The codefendant then pushed Griffiths to get him away from the defendant.  At that point, Marceline attacked the codefendant.  These differences have no bearing on the issues raised in this appeal. 
            [6] The transcripts of the interviews were not submitted with the defendant's motion in limine.  Nor does the record reflect that the transcripts had otherwise been provided to the judge by this point.
            [7] A major, and recurring, concern from that point on was the availability of a sufficient number of jurors to continue with the trial through verdict.  The judge conducted a voir dire of each of the fifteen empanelled jurors to determine their availability.  As a result, three jurors who could not accommodate the one-week delay were released.  Of the twelve jurors who remained, at least one would be unable to sit for more than three days after the resumption of trial.  This left the judge with the task of managing the remaining aspects of the trial, which included the remainder of the Commonwealth's case-in-chief, the defendant's and codefendant's evidence, any rebuttal evidence, closings, and instructions, during the jurors' remaining available time without shortchanging deliberations.  The transcript shows that this concern was at the forefront of the judge's mind for the remainder of the trial.  The transcript also shows that the parties wished, if possible, to see the trial to conclusion with the jury they had.
            [8] The transcripts had still not yet been introduced in evidence.
            [9] The issue is nonetheless preserved for appeal.  See Commonwealth v. Grady, 474 Mass. 715, 718-719 (2016).
            [10] Although the defendant's original position was that he wished to cross-examine Griffiths concerning the 2017 incident in addition to calling Marceline, as the case progressed and Griffiths's testimony concluded, the defendant's position appears to have evolved to only wanting to recall Marceline as a witness in his case. 
            [11] Nine States allow evidence of unrelated violent acts by the victim of which the defendant was unaware to support a claim of self-defense.  See People v. Wright, 39 Cal. 3d 576, 587 (1985) (permitting both evidence of specific acts of victim toward third persons as well as general reputation evidence); State v. Jordan, 329 Conn. 272, 279-280 (2018) (in homicide or assault prosecution where defendant claims self-defense, defendant may introduce victim's convictions for crimes of violence to show that victim was first aggressor); State v. DeLeon, 143 Haw. 208, 215 (2018) (where there is dispute regarding identity of first aggressor, defendant may introduce evidence of victim's prior acts of violence); People v. Lynch, 104 Ill. 2d 194, 200-202 (1984) (victim's convictions admissible for purpose of proving that victim was first aggressor); State v. Alderson, 260 Kan. 445, 461 (1996) (victim's prior criminal convictions admissible to prove that victim was first aggressor); State v. Lewchuk, 4 Neb. App. 165, 176 (1995) (evidence of specific instances of victim's violent conduct admissible to support defendant's claim that victim was first aggressor); Commonwealth v. Mouzon, 617 Pa. 527, 532 (2012) (evidence of victim's prior convictions involving aggression may be admitted as indirect evidence that victim was first aggressor); McMinn v. Rounds, 267 Va. 277, 281 (2004) (when defendant raises self-defense, proof of specific acts of victim are admissible to show victim's character for violence); Edwards v. State, 973 P.2d 41, 46 (Wyo. 1999) (defendant in assault or homicide case may introduce evidence of victim's specific conduct to prove that victim was first aggressor).
            [12] The Commonwealth did not at any point during the trial identify for the jury or the judge the statement upon which the Commonwealth relied as the factual basis for the charge.  Nor did the judge's instruction on the charge give guidance to the jury on that point.
            [13] General Laws c. 268, § 13B, was reorganized in 2018.  See St. 2018, c. 69, § 155.  However, "[t]he relevant language of the statute remains largely unchanged."  Commonwealth v. Bellard, 494 Mass. 446, 448 n.4 (2024).
            [14] The current, applicable version of the statute does not include "harm" or "punish" in its version of the quoted phrase and now includes "prevent."  See G. L. c. 268, § 13B (b).  The differences do not affect our analysis.
            [15] Because "the defendant neither raised the issue of duplicative convictions before the trial court, nor filed a motion to revise or revoke the sentence under Mass. R. Crim. P. 29, 378 Mass. 899 (1979), we review his claim only to determine if a substantial risk of a miscarriage of justice occurred."  Commonwealth v. Vick, 454 Mass. 418, 430 n.13 (2009).
            [16] Generally, "[a] crime is a lesser-included offense of another crime if each of its elements is also an element of the other crime."  Commonwealth v. Perry, 391 Mass. 808, 813 (1984).  Mayhem (second theory), which the defendant was convicted of, "is essentially an assault and battery by means of a dangerous weapon, with the additional aggravating factors of a specific intent to maim or disfigure, and certain forms of resultant physical injury" (citation omitted).  Commonwealth v. Ogden O., 448 Mass. 798, 808 (2007).  And "[t]he crime of assault and battery by means of a dangerous weapon, in violation of G. L. c. 265, § 15A, requires proof of three elements:  (1) the presence of all the elements of assault, and (2) a touching, however slight, (3) by means of a dangerous weapon."  Commonwealth v. Leonard, 90 Mass. App. Ct. 187, 190 (2016).   
            [17] The Commonwealth contends that Griffiths's injuries fall into three categories that the jury could have associated with the three charges:  the chest wound, as the basis for the mayhem conviction; the two abdominal wounds, as the factual basis for the assault and battery causing serious bodily injury and assault with intent to maim convictions; and the additional noncritical wounds to Griffiths's extremities, which the Commonwealth does not associate with any of these three charges.
            [18] The indictments would not have helped the jury in any event because, with the exception of the indictment for assault and battery by means of a dangerous weapon, which alleged that the crime was committed by a shod foot, the indictments did not identify the acts underlying the charges.